[Crim. No. 12813. In Bank. Dec. 21, 1970.]

In re WOODROW J. DOWNS on Habeas Corpus.

COUNSEL

Woodrow J. Downs, in pro. per., Ronald E. Mallen, under appointment by the Supreme Court, and Long & Levit for Petitioner.

Thomas C. Lynch, Attorney General, Daniel J. Kremer and James T. McNally, Deputy Attorneys General, for Respondent.

**OPINION**

**TOBRINER, J.**—On February 20, 1968, petitioner was convicted, upon his plea of guilty, of assault by means of force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)). On March 27, 1968, he moved to withdraw his guilty plea; the trial court denied this motion, denied probation and sentenced petitioner to state prison. We issued an order to show cause upon petitioner's allegations (1) that he was denied the effective assistance of counsel in that his attorney failed to investigate, and thereby withdrew, a crucial defense arising from petitioner's epilepsy and (2) that petitioner's guilty plea was involuntary because he was under the influence of heavy doses of medication provided by the medical staff of the jail at the time the plea was entered. We appointed the Honorable Richard F. Harris, Judge of the Superior Court of San Luis Obispo County, to act as referee.

After an evidentiary hearing, Judge Harris concluded that neither of petitioner's contentions was valid. He first found that petitioner's counsel was aware of petitioner's medical history of epilepsy, had made some inquiries of medical personnel, and was prepared to introduce medical evidence in

support of the defense if the case went to trial. The referee also found that counsel recognized the legal significance of a showing that petitioner was in the throes of an epileptic seizure at the time of the assault, i.e., that such proof would constitute a complete defense to the charged assault. Judge Harris concluded, however, that petitioner's attorney had substantial doubts as to whether the necessary factual showing could be made—doubts which found firm support in the record—and that, under the circumstances, the attorney's advice to plead guilty to a lesser charge with the possibility of probation did not constitute ineffective assistance of counsel.

Secondly, the referee found that the medication that petitioner had taken prior to his guilty plea did not render him unduly susceptible to suggestion or coercion and that the guilty plea was entered voluntarily and with full knowledge of its consequences. ■ "A referee's findings of fact are, of course, not binding on this court, and we may reach a different conclusion on an independent examination of the evidence produced at the hearing he conducts even where the evidence is conflicting. [Citation.] However, where the findings are supported by 'ample, credible evidence' [citation] or 'substantial evidence' [citation] they are entitled to great weight [citations] . . ." (*In re Branch* (1968) 70 Cal.2d 200, 203 [74 Cal.Rptr. 238, 449 P.2d 174]; *In re Cowans* (1970) 2 Cal.3d 733, 738 [87 Cal.Rptr. 499, 470 P.2d 635].) ■ As we discuss below, the instant record fully supports the referee's findings and we have therefore concluded that the requested writ of habeas corpus should be denied.

The assault to which petitioner pleaded guilty occurred in November 1967 in "Bradley's," characterized by various witnesses as a "rough bar." Petitioner had apparently been released from the county jail shortly before the incident, and, on the day of the assault, was in the midst of a rather prolonged drinking "bout." Although petitioner testified that he could not recall any of the events surrounding the crime—ostensibly a consequence of his epileptic "twilight state"— other witnesses gave the following account of the events leading to the assault.

After the bartender-owner of Bradley's had refused to serve petitioner any more drinks, another patron offered to buy him one. When the bartender would not permit petitioner a further drink, an argument ensued, resulting, finally, in the bar's "bouncer" removing petitioner from the bar. A short time later petitioner returned to the bar, became involved in another disturbance and the bouncer came over and grabbed petitioner. A general struggle erupted, in the process of which the bouncer was stabbed 11 times in the back.

As the victim fell to the floor, petitioner fled the bar and ran down the street; he was stopped a short distance away by a Navy shore patrolman who

detained him until the police arrived. When the police appeared petitioner had a knife in his hand; there was, however, no blood on either the knife or petitioner's person. A short time thereafter, petitioner suffered an epileptic seizure and was taken by the police to a hospital. Several days later he was transferred to the city jail, where he was initially charged, in separate counts, with (1) "assault with a deadly weapon with intent to commit murder" (Pen. Code, § 217), and (2) "assault by means of force likely to produce great bodily injury." (Pen. Code, § 245, subd. (a).)

After arraignment, Carl Fabbroni was appointed to represent the petitioner. Petitioner testified at the referee's hearing that during his first meeting with his counsel he disclosed his epileptic condition, told Fabbroni that he sometimes went into a "twilight state" during which time he had no control over his actions, and suggested that these ailments might constitute a defense to the crimes of which he was accused. Although Fabbroni stated at that time that he "would look into the matter," petitioner contends that his counsel never followed up this lead; Fabbroni's subsequent advice to plead guilty, it is claimed, was a direct product of the counsel's ineffective investigation, and amounted to constitutionally ineffective assistance of counsel.

In discussing the standards against which a claim of "ineffective assistance of counsel" is to be judged, in *In re Saunders* (1970) 2 Cal.3d 1033, 1041-1042 [88 Cal.Rptr. 633, 472 P.2d 921], we noted that one fundamental standard "is that which places upon counsel the duty to conduct careful factual and legal investigations and inquiries with a view to developing matters of defense in order that he may make informed decisions on his client's behalf both at the pleading stage [citations] and at trial [citations]. If counsel's 'failure [to undertake such careful inquiries and investigations] results in withdrawing a crucial defense from the case, the defendant has not had the assistance to which he is entitled. [citations.]' " Petitioner's first contention is essentially that his counsel failed to meet this criterion.

The record, however, does not support this allegation. Most significantly, petitioner failed to make any showing that his counsel had neglected to contact physicians who had treated him in the past or had failed to uncover relevant medical records. Because, in this petition for habeas corpus, petitioner bears the burden of establishing the inadequacy of his counsel's efforts (cf. *In re Smith* (1970) 2 Cal.3d 508, 510 [86 Cal.Rptr. 4, 467 P.2d 836]), this omission is, of course, a crucial one. (Cf. *In re Saunders* (1970) 2 Cal.3d 1033, 1048 [88 Cal.Rptr. 633, 472 P.2d 921].)

Moreover, although Fabbroni died prior to the referee's hearing and thus could not personally relate exactly what steps he had taken in connection with petitioner's medical defense, and counsel's notes which were preserved did not contain this information, evidence was presented at the referee's

hearing which demonstrates that, contrary to petitioner's allegation, the attorney had pursued this issue. First, the record establishes that Fabbroni had subpoenaed Mr. Tudor, an executive of the Epilepsy Society, and petitioner's medical records, for use on the day of the trial. Although these subpoenas were issued only one day prior to the trial, admittedly quite late, their issuance at least establishes that counsel was aware of, and was acting to present, the epilepsy defense. Second, the district attorney who prosecuted petitioner testified that on the date set for trial, petitioner's counsel brought to court several medical texts dealing with epilepsy; a reasonable inference is that counsel planned to use these in advancing petitioner's medical claims. Third, petitioner's own account of his discussion with counsel on the date of the guilty plea demonstrates that the attorney was not unaware of the possibilities of the epilepsy defense.[1] Petitioner did not testify that Fabbroni had forgotten his medical background, or that his attorney deprecated the illness' potential *legal* value (cf. *In re Williams* (1969) 1 Cal.3d 168, 176 [81 Cal.Rptr. 784, 460 P.2d 984]); instead, petitioner disclosed that his counsel's reservations about the epilepsy defense were based on doubts as to the defense's ability to convince the jury of the factual accuracy of petitioner's story.

Fabbroni's doubts on this score are certainly understandable in light of other evidence introduced at the referee's hearing. Dr. Frank, a prison doctor who had treated petitioner over several months, testified that the kind of epilepsy from which petitioner suffered—"Gran Mal"—was not usually characterized by long "twilight periods," but generally only by attacks of momentary length. The doctor stated that the lengthy "twilight state" into which petitioner claimed he had lapsed at the time of the assault occurred primarily in psychomotor epilepsy, and usually not in "Gran Mal."

Furthermore, the contention that the assault occurred during an epileptic "twilight state" rested solely on petitioner's own account; apparently Fabbroni's investigation disclosed that none of the eyewitnesses were able to substantiate this aspect of the incident. Thus, in practical terms, the probative value of the epilepsy claim turned principally on petitioner's credibility; defense counsel was keenly aware that petitioner, who had a long record of convictions over 30 years, many arising out of and connected with the use of alcohol, would be a highly suspect witness.

---

[1] At the referee's hearing petitioner gave the following account of his discussion with counsel: "I said, 'You have the medical records and subpoened witnesses and this is for the court. I don't want to plead [guilty].' He said 'I told you I've got it all ready' and I said—and then he started talking to me. This was when he said he couldn't win the case. He said, 'I'm going to try to be honest with you; I can't win with your back records.' He says, 'because the jury, if I go in and plead that you had a blackout during this crime,' he says, 'the jury will say you were drunk and from alcohol and you didn't remember.' "

Recognizing these fundamental weaknesses in the defense's case, petitioner's counsel advised his client to accept the "plea bargain" offered, on the day set for trial, by the district attorney. The prosecutor agreed to dismiss the more serious charge of "assault with a deadly weapon with intent to commit murder" in exchange for petitioner's agreement to plead guilty to "assault by any means or force likely to produce great bodily injury;" the former offense carries a term of from 1 to 14 years, the latter is punishable by imprisonment of not more than 10 years. In addition, the prosecutor promised that if the trial judge should decide that probation was appropriate, he would give his approval. At the time of the plea the statutory and decisional law provided that petitioner, who had suffered at least two prior felony convictions, would not have been eligible for probation without the prosecutor's concurrence. (Pen. Code, § 1203.) Thus, the plea bargain negotiated by Mr. Fabbroni and agreed to by petitioner freed the petitioner from the risks of conviction of a more serious crime and secured at least a possibility of probation.[2]

The foregoing facts clearly support the referee's conclusion that petitioner's counsel did not fail either to ascertain or to investigate the substantial defense allegedly arising from petitioner's epilepsy, and was not constitutionally ineffective in advising petitioner to plead guilty.

■ Petitioner secondly alleges that on February 20, 1968, when he entered the plea of guilty, he was in "a confused and drugged state," resulting from the "massive doses" of medication he was receiving from the jail's medical authorities, and that it was only by virtue of his "drugged" condition that he was persuaded by his counsel to plead guilty. Petitioner thus maintains that his guilty plea was involuntary, and that the trial court abused its discretion in refusing to permit him to withdraw the plea.

At the reference hearing, Dr. Frank did admit that he had prescribed a variety of medication for petitioner in treatment of his epilepsy condition.[3]

---

[2]Petitioner now claims that, in view of his past record, the possibility of probation was totally illusory and should have been so recognized by Fabbroni. Judge Abernathy, who received defendant's guilty plea and sentenced petitioner, testified at the referee's hearing, however, that petitioner's record did not automatically exclude the possibility of probation and that, in the past, other defendants, with similar records, had on occasion been granted probation. Petitioner's counsel cannot be faulted for attempting to preserve this possibility of probation.

[3]Dr. Frank testified that he had treated many epileptics throughout his professional career and had done research with respect to the effect of drugs on epileptics. He prescribed "normal" doses of Dilantin and Phenobarbital, drugs which petitioner had been taking for several years. When petitioner later complained of nervousness, the doctor prescribed Meprobamate, a mild tranquilizer which petitioner also stated he had taken in the past. Petitioner also developed some itching, "secondary to foot dermititus" and was given Benadril for that ailment. The physician testified that these drugs are not cumulative and that none of the drugs potentiate the other drugs in the dosages given.

The doctor's description of the potential effect of the precribed drugs, however, contrasts markedly with that contained in petitioner's allegations. Dr. Frank testified that the various medications given petitioner would tend to restore a patient to a normal state, would not reduce his ability to know or understand the consequences of his actions, and would not render a patient more susceptible to suggestion by other persons.

Dr. Frank's description of the potential effect of the drugs appears to be borne out by the testimony of Judge Abernathy, who presided over the proceedings at which petitioner entered his guilty plea. In his testimony at the referee's hearing, Judge Abernathy observed that at the time of the plea petitioner did not appear drowsy, had no trouble responding to questions posed by the court, did not exhibit slurred speech and seemed capable of understanding all that was occurring. Although the judge recalled that petitioner was somewhat pale and did complain of the sheriff's failure to properly care for a stomach ailment,[4] the petitioner showed no indications of being in a "drugged state." The district attorney, who was also present on this occasion, reiterated this description.

On this evidence the referee found that petitioner had failed to establish that his guilty plea was an "involuntary" product of a drugged condition; we fully agree with that conclusion. The record clearly establishes that petitioner's guilty plea was the voluntary product of a negotiated "plea bargain," which petitioner fully discussed with his counsel; by his own admission, petitioner was seeking a chance at probation and an honor farm commitment, rather than a prison sentence, and the bargain to which he agreed afforded him the best opportunity to obtain such treatment.

In sum, petitioner has failed to establish either that his counsel's assistance was constitutionally ineffective or that his guilty plea was involuntary.

The order to show cause is discharged and the petition for the writ of habeas corpus is denied.

Wright, C. J., McComb, J., Peters, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

Petitioner's application for a rehearing was denied January 21, 1971.

---

[4] The judge expressed surprise and disapproval over the sheriff's refusal to permit an X-ray of petitioner's stomach, and later signed an order directing the sheriff to take petitioner to the county hospital for X-rays.