[No. S015706. Crim. No. 25064. Nov. 4, 1993.]

In re KEITH SANFORD HITCHINGS on Habeas Corpus.

## COUNSEL

Thomas Lundy and Richard J. Ingram, under appointments by the Supreme Court, for Petitioner.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart and George Williamson, Chief Assistant Attorneys General,

John H. Sugiyama, Assistant Attorney General, Morris Beatus, Dane R. Gillette and Ronald E. Niver, Deputy Attorneys General, for Respondent.

## Opinion

**LUCAS, C. J.**—Keith Sanford Hitchings was convicted in Humboldt County Superior Court of the first degree murder of Rebecca Jensen and the second degree murder of James Jensen. (Pen. Code, § 187; all further statutory references are to this code unless otherwise indicated.) A multiple-murder special-circumstance allegation was also sustained. (§ 190.2, subd. (a)(3).) The jury set the penalty at death.

Petitioner appealed and also filed a petition for a writ of habeas corpus alleging juror misconduct. This court found he stated a prima facie case for relief in his habeas corpus petition and issued an order to show cause. In addition, we appointed J. Michael Brown, Judge of the Superior Court of Humboldt County, to act as our referee. Judge Brown has now filed his report. After due consideration, we conclude the writ should be granted and petitioner's convictions vacated.

### Facts

In June 1982, petitioner drove to a rodeo at Ruth Lake with his girlfriend, Shannon Pellegrini. He drank several cans of beer along the way and was intoxicated when the two arrived at the lake. Petitioner met some relatives at the rodeo and continued to drink. Later that night, he argued with Pellegrini and left their campground on foot. Early the next morning, he was seen hitchhiking and was picked up by three men. The foursome spent most of that day together, drinking beer in various places around Humboldt County. Some methamphetamine was ingested. When the party broke up, petitioner ended up alone, on foot in the town of Loleta, and apparently intoxicated.

That night, he went door to door in an attempt to secure a place to sleep. Deputy Sheriff Mayton found petitioner walking along a road in the victims' neighborhood. Petitioner appeared intoxicated and his pants were ripped. He had scratches on his arms and a fresh wound on his hand. He also appeared to have blood on his arms and shoes. Mayton took petitioner into custody for being drunk in public and also for his own safety. Although petitioner told Mayton he had a knife in a sheath on his belt, Mayton did not find one. When he was handcuffed, petitioner said, "You [would] think that I have committed murder or armed robbery or something."

The bodies of James and Rebecca Jensen, both in their 80's, were found later. They had been severely beaten, apparently with a baseball bat. Mrs.

Jensen's blouse had been pulled up, her pants pulled down, and her underpants torn from her body. Petitioner was tied to the crime scene by his boot prints and the discovery of his knife (and its sheath) at the Jensens' home. Pellegrini identified the knife as belonging to petitioner.

## Habeas Corpus

Following petitioner's conviction, defense attorney William Kay visited his former law partner, James McKittrick. McKittrick informed Kay that the previous evening, he had met a woman who worked at a local savings and loan. Their conversation turned to petitioner's trial and the woman, later identified as Kim Robinson, said she had worked with one of the jurors who sat on petitioner's case. Robinson said she was surprised that the juror, Cathy Nordstrom, had remained on the jury because Nordstrom appeared to have made up her mind about the case prior to being chosen. In addition, Robinson said there had been substantial discussion about the case at the savings and loan where they worked. Following these revelations, Kay contacted petitioner's appellate attorney, Tom Lundy, and commenced an investigation.

Petitioner then filed a petition for a writ of habeas corpus alleging Juror Cathy Nordstrom committed misconduct by (i) concealing, on voir dire, her knowledge of the case and her bias against him; (ii) prejudging the case; and (iii) improperly discussing the case with nonjurors during the pendency of the trial. Declarations from Nordstrom's coemployees at First Security Savings and Loan (the bank) supported these allegations. The bank was located in Eureka, only a few miles from Loleta, the scene of the crime. We issued an order to show cause (see *In re Hochberg* (1970) 2 Cal.3d 870, 873-874, fn. 2 [87 Cal.Rptr. 681, 471 P.2d 1]), and appointed Judge Brown as our referee to take evidence. Our order directed him to answer three questions: "1. Did juror Cathy Nordstrom have greater knowledge of this case than she revealed on voir dire? 2. Had Nordstrom prejudged petitioner's guilt prior to trial? 3. Did Nordstrom discuss the case with her co-workers or others while sitting as a juror in this case?"

## Cathy Nordstrom

At the evidentiary hearing before the referee, Nordstrom testified that she and Kim Robinson were tellers at the bank, Robinson occupying the adjoining teller window. Nordstrom testified she first heard about petitioner's case when told she would be a juror in his case. Although Barbara Peterson, another bank employee, had known the victims, Nordstrom said she was unaware of that fact. Another employee, Larry Whitford, allegedly was

affiliated with the sheriff's department and had some knowledge of the case, but Nordstrom said she was unaware of that fact as well. She did not remember anyone at the bank discussing the case.

Nordstrom testified she continued working at the bank during the trial. Although petitioner's family had opened a savings account at the bank to provide for his defense, Nordstrom said she did not become aware of the account until after the trial commenced. She said she did not remember any discussions in the bank about the Hitchings family account. She recalled that once, someone transacting business at the bank recognized her as a juror and became verbally abusive toward her. She reported this incident to the trial judge.

Nordstrom admitted that after work, she sometimes went with Kim Robinson to a local bar named Frankie's Champagne Palace. She described the frequency of these events as "[o]nce every couple of weeks or so." When asked whether she went to the bar with Robinson after a day in court, Nordstrom replied, "It's possible. I could have." Later, however, she admitted she told a defense investigator that she found the trial upsetting and that she "often" went for a drink after court. She unequivocally stated, however, "I did not discuss this case with anybody during the trial."

Nordstrom reaffirmed that she had no advance knowledge of the case prior to being chosen as a juror. She stated that *during* trial, she did not read any newspapers or watch television. When asked whether she read newspapers or watched television during the period *before* trial, she replied, "I don't believe I did."

In her jury questionnaire, completed in January 1983, and admitted at the evidentiary hearing, Nordstrom stated she was unfamiliar with the names Keith Hitchings, James and Rebecca Jensen, or the "facts surrounding an alleged murder of two elderly people in Loleta." Later, when questioned by the court on voir dire, she replied that her husband told her two people were killed in Loleta, but that was all she knew about the case. She stated she was on vacation at the time of the crime and knew nothing more about the case. She affirmed her ability to be "fair to both sides," and when asked whether she had "formed any opinion about the guilt or innocence of Mr. Hitchings," she answered "I don't know anything about it."

Nordstrom averred that she was "interested" in being on the jury, but was not "anxious" to serve. Although she stated in a signed declaration that she was one of the last two jurors to vote for guilt, she equivocated from that position at the evidentiary hearing, saying she "may" have been one of the last.

Nordstrom acknowledged that sometime after the trial, the bank fired her for cashing personal checks directly out of her cash drawer in violation of banking rules. Moreover, the checks she cashed represented benefits from the Social Security Administration to which she knew she was not entitled because she had remarried. She admitted that she had reached an agreement with the federal government to make restitution. Finally, she conceded that when she filed for unemployment compensation, she did not disclose she had been fired by the bank for cashing the Social Security checks. Although she admitted she lied, she stated that, "Basically I'm an honest person. People do things that are wrong, and can still be honest."

Nordstrom said Kim Robinson was her closest friend at the bank and that they parted as friends. She did not know why Robinson would lie about her. On cross-examination, she said Larry Whitford never spoke to her about petitioner's case, although he did help her get a loan.

*Kim Robinson*

Kim Robinson's testimony directly contradicted Nordstrom's account in various particulars. Robinson confirmed that she was a friend of Nordstrom and worked with her at the bank. She first heard of the murders from coworker Barbara Peterson, who knew the victims and whose husband was the arresting officer. Robinson said she also heard about the killings on the television news and from customers. She said there was a lot of publicity about the case. The day after the crime, she heard petitioner had been arrested for the crime. Robinson was acquainted with petitioner from having attended the same middle school with him. She said he was not a personal friend and that she did not socialize with him.

Robinson testified that after the slayings, there were discussions about the crime at the bank. Regarding these discussions, Robinson said, "A lot of it was very biased, because it was coming from people . . . that lived in Loleta. Um, we just heard a lot of things going on . . . because . . . Barbara Peterson's husband being one of the arresting officers, and Larry Whitford being one of the arresting people, so there was a big discussion."[1] When asked if Nordstrom took part in these discussions, Robinson replied, "*All* the employees at the bank took part in the conversation." (Italics added.)

Robinson said that immediately after the crime, the employees would discuss it often. In addition, the employees would talk about the crime when one of petitioner's family members came into the bank, or when the local

[1] Later, on cross-examination, Robinson corrected this statement, explaining that to her knowledge, Whitford was not one of the arresting officers.

newspaper contained a new article about the crime. Robinson asserted that all the bank employees talked about the case and all, including Nordstrom, felt that petitioner was guilty. Robinson also testified that, *prior to trial*, she had personal conversations with Nordstrom about the case, and Nordstrom made negative comments about petitioner.

In addition, contrary to Nordstrom's testimony, Robinson testified that all the tellers dealt with transactions concerning the Hitchings family savings account. When a Hitchings family member came in to make a deposit, the tellers "would always discuss [the case]." Asked whether Nordstrom knew of the account prior to trial, Robinson replied, "I'm sure she did, yes." When Nordstrom was chosen as a juror, Robinson was shocked because she "just felt that not only Cathy, [but] anybody that worked at the bank, had too much knowledge to be on a jury and not feel bias about the case, because we had heard so many things about [petitioner], and the actual scene of the crime."

After Nordstrom was chosen as a juror, Robinson testified the two would still meet most nights at Frankie's Champagne Palace. During these meetings, Nordstrom would "sometimes" discuss the case with Robinson, despite the fact that she was still sitting as a juror. Robinson said that "[e]verything that [Nordstrom] had to say was . . . very biased against [petitioner] and negative." One incident stood out in Robinson's mind because it was the first time Nordstrom spoke directly about the case. Nordstrom said petitioner "deserved to be taken out, strung up or lynched up. He—he needed to have his—be sexually abused, cut up, and I . . . asked her what she was saying, and she said, that, um, she felt an eye for an eye, tooth for a tooth, and that's what happened to these people, so he deserved it, too." Robinson was sure Nordstrom uttered these comments before the case was submitted to the jury for deliberations. Robinson had had other conversations with Nordstrom about the trial, but Nordstrom had never been so "direct" or "hostile." "[H]er opinions were obviously that [petitioner] was guilty, . . . but she had never been as direct. It was always subtle."

Robinson was reluctant to come forward with this information because she thought the district attorney would discover Nordstrom's bias and disqualify her without Robinson's assistance. In addition, she considered Nordstrom a friend and did not want to get her in trouble. Finally, Robinson's mother still lived in the area and Robinson was afraid she would be harassed.

On cross-examination, Robinson was impeached by an inconsistency between her testimony and her signed declaration. In her declaration, she said the above mentioned critical conversation with Nordstrom at Frankie's

Champagne Palace occurred *after* the trial, whereas she testified it was *during* trial. Robinson explained that petitioner's counsel had prepared the declaration for her signature, that the declaration was inaccurate, and she reaffirmed that the conversation occurred during trial.

In addition, although Robinson stated in a declaration that there was "almost a constant discussion" of the case as a result of family deposits in the Hitchings savings account, the district attorney attempted to demonstrate that petitioner's relatives made only five deposits in the subject account. The exhibits, however, reveal there were eight deposits in July and August 1982; trial began in January 1983.

Robinson was rehabilitated by later questioning showing petitioner's relatives also made deposits to their own private accounts during this period. This was corroborated by the testimony of Andrea Taylor, petitioner's cousin, who testified she made several deposits into her personal account during this time. Moreover, Taylor stated that if Robinson was the teller that helped her, they would invariably discuss petitioner's case. Dolores Torgersen, petitioner's aunt, also testified. Her savings account passbook showed she made three deposits and two withdrawals from her private account in the six months prior to petitioner's trial. She testified she conducted these transactions in person at the bank.

*Other Witnesses*

Robinson's account was largely corroborated by Paula Wyman-Tomlin, who had also worked in the bank with Robinson and Nordstrom. Wyman-Tomlin confirmed that after the murders, there were discussions about the crime at the bank and that Nordstrom took part in them. She said everyone at the bank was both biased against petitioner and "outraged" Nordstrom was chosen to serve on the jury. Although she could not remember Nordstrom's actual comments, she stated Nordstrom had expressed a desire to serve on petitioner's jury and that prior to being chosen as a juror, she had already decided he was guilty. Wyman-Tomlin believed Nordstrom was a biased juror.

Wyman-Tomlin also testified that everyone at the bank knew about the Hitchings family account, and that fact was discussed among the employees. She could not, however, remember whether these discussions took place before, during, or after the trial.

Larry Whitford testified for the People. In March 1983, he was sworn in as a level three reserve officer for the sheriff's department. Prior to that, he

was a level four reserve officer and performed no law enforcement duties for the department. He had been interviewed for the level three position in early 1982, while he was still working as a loan officer at the bank. He was not the arresting officer in petitioner's case and had never been to the crime scene. He had two friends in the sheriff's department at that time, but neither provided him with information about the murders.

Whitford knew both Nordstrom and Robinson from his job at the bank; he said "they seemed to be good friends." He also testified that the murders in Loleta were a "major conversation" topic at the bank, that the matter was discussed "every morning," that "everyone" at the bank discussed the case, and that he would be surprised if one of the bank employees had not heard any information about the crime. When asked about his signed declaration that stated he did not discuss the case with his coworkers at the bank, Whitford admitted the declaration was not true. He did not remember if any coworkers asked him about the murders, but affirmed that he sometimes met Nordstrom and Robinson after work at Frankie's Champagne Palace.

When asked whether he thought Nordstrom was a trustworthy person, Whitford equivocated slightly, saying he had dealt with her on a strictly professional basis and was not aware of any information that would make her untrustworthy other than some third-hand information concerning Nordstrom's prior employer. When asked about this information, the prosecutor successfully objected on hearsay grounds.

### The Referee's Ruling

After hearing evidence, Judge Brown issued his report. Apart from summarizing the evidence, the following represent his entire findings and conclusions in this matter: "1. Cathy Nordstrom had greater knowledge of this case than she revealed on voir dire. The Court finds, by a preponderance of the evidence, that Cathy Nordstrom at least overheard conversations regarding the double homicide while employed at First Security Savings and Loan prior to her selection as a juror.

"2. Cathy Nordstrom did not prejudge Petitioner's guilt prior to trial. No credible testimony was received indicating that Cathy Nordstrom had in fact prejudged the defendant's guilt. Although she had knowledge regarding the case, no credible testimony was received indicating that she expressed any opinion regarding the defendant's guilt or regarding the double homicide at all prior to her selection as a trial juror. The Court does not consider Ms. Nordstrom's conversations regarding the case at Frankie's Champagne Palace following her selection as a juror as indicative of her having prejudged

the case. Although certainly the discussions should not have taken place and were a violation of the trial court's admonition to all jurors, the most that can be said for the discussions is that Ms. Nordstrom was being influenced by the evidence she was hearing and forming impressions thereof and passing those impressions on to Kim Robinson. Ms. Nordstrom was one of the last jurors to vote for a guilty verdict indicating that she had not, prior to the submission of the case, prejudged the defendant's guilt, although she certainly had been swayed by the evidence received.

"3. Cathy Nordstrom did discuss the case with her co-workers while sitting as a juror in this case. As stated above, the court finds Kim Robinson to be generally believable and therefore finds that the conversations did take place at Frankie's Champagne Palace during the guilt phase of the trial."

We did not ask the referee to make a recommendation regarding whether petitioner was entitled to relief. Accordingly, none was made.

## DISCUSSION

Petitioner challenges the referee's findings and contends he is entitled to relief because of juror misconduct. ■ The applicable standard of review is clear. "The referee's conclusions of law are subject to independent review, as is his resolution of mixed questions of law and fact. [Citations.] . . . The referee's findings of fact, though not binding on the court, are given great weight when supported by substantial evidence. The deference accorded factual findings derives from the fact that the referee had the opportunity to observe the demeanor of witnesses and their manner of testifying." (*In re Marquez* (1992) 1 Cal.4th 584, 603 [3 Cal.Rptr.2d 727, 822 P.2d 435]; see also *In re Jackson* (1992) 3 Cal.4th 578, 585 [11 Cal.Rptr.2d 531, 835 P.2d 371]; *In re Cordero* (1988) 46 Cal.3d 161, 180-181 [249 Cal.Rptr. 342, 756 P.2d 1370].)

It is important to reiterate that the deference to which a referee's factual findings are entitled is appropriate only if substantial and credible evidence supports the findings. As we explained in *People* v. *Ledesma* (1987) 43 Cal.3d 171 [233 Cal.Rptr. 404, 729 P.2d 839], a referee's factual findings are " 'not binding on this court, and we may reach a different conclusion on an independent examination of the evidence produced at the hearing he conducts even where the evidence is conflicting. [Citation.] However, where the findings are supported by "ample, credible evidence" [citation] or "substantial evidence" [citation] they are entitled to great weight. . . .' " (*Id.* at p. 219, quoting *In re Branch* (1969) 70 Cal.2d 200, 203, fn. 1 [74 Cal.Rptr. 238, 449 P.2d 174]; see also *In re Hall* (1981) 30 Cal.3d 408, 416 [179

Cal.Rptr. 223, 637 P.2d 690] [also quoting *Branch* with approval]; *In re Downs* (1970) 3 Cal.3d 694, 697 [91 Cal.Rptr. 612, 478 P.2d 44] [same].)

Petitioner alleges he is entitled to a new trial because Nordstrom committed three types of juror misconduct: (i) she concealed the extent of her prior knowledge of the case on voir dire; (ii) she spoke to Robinson about the case while a sitting juror and before the case had been decided; and (iii) she prejudged the case.

## A. *Juror Misconduct*

### 1. *Juror Concealment on Voir Dire*

■ We begin with the general proposition that one accused of a crime has a constitutional right to a trial by impartial jurors. (U.S. Const., 6th and 14th Amends.; Cal. Const., art. I, § 16; *People v. Wheeler* (1978) 22 Cal.3d 258, 265 [148 Cal.Rptr. 890, 583 P.2d 748]; *Weathers v. Kaiser Foundation Hospitals* (1971) 5 Cal.3d 98, 110 [95 Cal.Rptr. 516, 485 P.2d 1132].) " 'The right to unbiased and unprejudiced jurors is an inseparable and inalienable part of the right to trial by jury guaranteed by the Constitution.' " (*Weathers v. Kaiser Foundation Hospitals, supra*, at p. 110, quoting *People v. Galloway* (1927) 202 Cal. 81, 92 [259 P. 332] [hereafter *Galloway*].)

The impartiality of prospective jurors is explored at the preliminary proceeding known as voir dire. "*Voir dire* plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored. Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled. [Citation.] Similarly, lack of adequate *voir dire* impairs the defendant's right to exercise peremptory challenges where provided by statute or rule . . . ." (*Rosales-Lopez v. United States* (1981) 451 U.S. 182, 188 [68 L.Ed.2d 22, 28-29, 101 S.Ct. 1629].)

The ability of a defendant, either personally, through counsel, or by the court, to examine the prospective jurors during voir dire is thus significant in protecting the defendant's right to an impartial jury. ■ Of course, the efficacy of voir dire is dependent on prospective jurors answering truthfully when questioned. As the United States Supreme Court has stated, "*Voir dire* examination serves to protect [a criminal defendant's right to a fair trial] by exposing possible biases, both known and unknown, on the part of potential

jurors. Demonstrated bias in the responses to questions on voir dire may result in a juror's being excused for cause; hints of bias not sufficient to warrant challenge for cause may assist parties in exercising their peremptory challenges. The necessity of truthful answers by prospective jurors if this process is to serve its purpose is obvious." (*McDonough Power Equipment, Inc.* v. *Greenwood* (1984) 464 U.S. 548, 554 [78 L.Ed.2d 663, 670, 104 S.Ct. 845] (plur. opn. of Rehnquist, J.).)[2]

A juror who conceals relevant facts or gives false answers during the voir dire examination thus undermines the jury selection process and commits misconduct. (*People* v. *Castaldia* (1959) 51 Cal.2d 569, 572 [335 P.2d 104] [hereafter *Castaldia*]; *Galloway, supra,* 202 Cal. at pp. 92-93; *People* v. *Blackwell* (1987) 191 Cal.App.3d 925, 929 [236 Cal.Rptr. 803] [hereafter *Blackwell*]; *People* v. *Diaz* (1984) 152 Cal.App.3d 926, 932 [200 Cal.Rptr. 77] [hereafter *Diaz*].)

Without truthful answers on voir dire, the unquestioned right to challenge a prospective juror for cause is rendered nugatory. Just as a trial court's improper *restriction* of voir dire can undermine a party's ability to determine whether a prospective juror falls within one of the statutory categories permitting a challenge for cause (see *People* v. *Wright* (1990) 52 Cal.3d 367, 419 [276 Cal.Rptr. 731, 802 P.2d 221]; *People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1083-1084 [259 Cal.Rptr. 630, 774 P.2d 659]), a prospective juror's *false answers* on voir dire can also prevent the parties from intelligently exercising their statutory right to challenge a prospective juror for cause.

Such false answers or concealment on voir dire also eviscerate a party's statutory right to exercise a peremptory challenge and remove a prospective juror the party believes cannot be fair and impartial. We have recognized that "the peremptory challenge is a critical safeguard of the right to a fair trial before an impartial jury." (*People* v. *Williams* (1981) 29 Cal.3d 392, 405 [174 Cal.Rptr. 317, 628 P.2d 869].) As explained by the Court of Appeal, "[j]uror concealment, regardless whether intentional, to questions bearing a substantial likelihood of uncovering a strong potential of juror bias, undermines the peremptory challenge process just as effectively as improper judicial restrictions upon the exercise of voir dire by trial counsel seeking

---

[2]Sixty years ago, Justice Cardozo expressed similar sentiments: "The judge who examines on the *voir dire* is engaged in the process of organizing the court. If the answers to the questions are wilfully evasive or knowingly untrue, the talesman, when accepted, is a juror in name only. His relation to the court and to the parties is tainted in its origin; it is a mere pretense and sham. What was sought to be attained was the choice of an impartial arbiter. What happened was the intrusion of a partisan defender. If a kinsman of one of the litigants had gone into the jury room disguised as the complaisant juror, the effect would have been no different. The doom of mere sterility was on the trial from the beginning." (*Clark* v. *United States* (1933) 289 U.S. 1, 11 [77 L.Ed. 993, 998, 53 S.Ct. 465].)

knowledge to intelligently exercise peremptory challenges." (*Diaz, supra,* 152 Cal.App.3d at p. 932; see also *Blackwell, supra,* 191 Cal.App.3d at p. 931.) "The denial of the right to reasonably exercise a peremptory challenge, be it by either the trial court *or a juror through concealing material facts,* is not a mere matter of procedure, but the deprivation of an absolute and substantial right historically designed as one of the chief safeguards of a defendant against an unlawful conviction." (*Diaz, supra,* 152 Cal.App.3d at p. 933, italics added; see also *Rosales-Lopez v. United States, supra,* 451 U.S. at p. 188 [68 L.Ed.2d at pp. 28-29].)[3]

Thus, " '[w]here a party has examined the jurors concerning their qualifications, and they do not answer truly, it is manifest that he is deprived of his right of challenge for cause, and is deceived into foregoing [*sic*] his right of peremptory challenge.' " (*Galloway, supra,* 202 Cal. at p. 94.) "The prosecution, the defense and the trial court rely on the voir dire responses in making their respective decisions, and if potential jurors do not respond candidly the jury selection process is rendered meaningless. Falsehood, or deliberate concealment or nondisclosure of facts and attitudes deprives both sides of the right to select an unbiased jury and erodes the basic integrity of the jury trial process." (*Blackwell, supra,* 191 Cal.App.3d at p. 929.)

█ In the present case, the referee found Nordstrom had greater knowledge of the case than she revealed on voir dire, and that she *"at least* overheard conversations regarding the double homicide while employed at [the bank]." (Italics added.) We agree with this assessment; the evidence clearly shows this minimal amount of knowledge on Nordstrom's part. We thus adopt the referee's finding as to our first question.

Moreover, the record contains substantial evidence showing Nordstrom not only passively overheard such conversations, but actually participated in pretrial conversations about the crime, expressing an opinion about it as well. █ In answering our second question, however, the referee found that "[a]lthough [Nordstrom] had knowledge regarding the case, no credible testimony was received indicating that she expressed any opinion regarding the defendant's guilt or regarding the double homicide at all prior to her selection as a trial juror."

---

[3]We express no opinion whether the provisions of Code of Civil Procedure section 223, as enacted by Proposition 115 in 1990, will affect this analysis for cases arising after passage of that statewide proposition. (See *People* v. *Noguera* (1992) 4 Cal.4th 599, 646 [15 Cal.Rptr.2d 400, 842 P.2d 1160] [acknowledging the issue but finding prosecutor's questions proper under either standard].) Since petitioner's case both arose and was concluded well before 1990, the new statutory provision concerning peremptory challenges is inapplicable here. (See *Tapia* v. *Superior Court* (1991) 53 Cal.3d 282 [279 Cal.Rptr. 592, 807 P.2d 434] [Prop. 115 applicable to crime occurring before passage where the trial was held after passage].)

Petitioner formally excepts to the referee's ruling on this point. In support, he argues the referee ignored the contrary evidence provided by Robinson and defense attorney Will Kay. During the questioning of Robinson, for example, the following exchange occurred:

"Q: Did you have—*this is prior to Cathy being picked as a juror*—did you have discussions about the case with Cathy? A: Yes, I did.

"Q: And were most—how would you characterize those discussions as to feelings about Keith Hitchings? A: Um, I think that the things that we heard about Keith Hitchings were very negative.

"Q: And do you know if—if Cathy Nordstrom, *prior to the trial, was making negative comments about Keith Hitchings*?" A: *Yes.*" (Italics added.)

Later, a similar exchange occurred:

"Q: . . . Before [Nordstrom] was picked as a juror, did she ever indicate her feelings about the guilt or innocence of Mr. Hitchings?. A: *This is before she was picked as a juror?*

"Q: *Yes.* A: *Yes.*

"Q: What did she indicate? A: We all talked about it, as employees together, and from the information we had gathered from . . . other employees . . . I think we all felt that he was guilty.

"Q: Okay. *Do you remember Cathy expressing that belief?* A: *Yes.*" (Italics added.)

Thus, contrary to Nordstrom's claim of no prior knowledge of the case, Robinson expressly declared that the subject of the killings was raised at the bank before trial, that Nordstrom was a part of those conversations, and that Nordstrom expressed the opinion that petitioner was guilty. (Will Kay's testimony on the topic consisted mainly of his recitation of what Robinson told him. It is thus of lesser probative value.)

In his summary of the evidence adduced at the hearing, the referee failed to include references to these passages. Petitioner infers from this omission that the referee improperly failed to consider this evidence. The inference is a weak one at best. The inference, standing alone, is not sufficient to overcome the referee's explicit finding that Nordstrom did not discuss the case prior to trial.

That is not to say, however, that the referee's finding on this point was supported by ample evidence. Indeed, there was much evidence supporting Robinson's credibility, and not much supporting Nordstrom's version of events. For example, Robinson described the circumstances surrounding Nordstrom's conduct in some detail, including: (i) the employee conversations at the bank, (ii) the renewal of such conversations when petitioner's relatives transacted business at the bank, and (iii) the renewal of discussions when newspaper articles on the subject were published. Moreover, her account was largely corroborated by Larry Whitford, one of *the People's* witnesses, by Paula Wyman-Tomlin, another employee at the bank, and Andrea Taylor, petitioner's cousin. Finally, there was evidence that Nordstrom was generally not a trustworthy person, and some evidence that testifying for the defense was against Robinson's self-interest.[4]

In contrast to this evidence, the referee found Nordstrom was not believable on certain points, finding she knew more about the case than she had previously claimed, and that she violated her oath by discussing the case with Robinson after trial sessions.

Although the evidence supporting the referee's finding on this point is not overwhelming, the proper inquiry is whether there was substantial evidence to support his decision. (*People v. Ledesma, supra*, 43 Cal.3d at p. 219.) The referee was able to view the demeanor of the witnesses and evaluate their veracity. This ability is of vital importance when, as here, the critical decision turns on the credibility of the witnesses. Although the referee clearly did not believe Nordstrom in many particulars, he was entitled to conclude she spoke the truth as to some points. On balance, we uphold the referee's finding that there was no credible evidence showing Nordstrom discussed petitioner's case prior to his trial, and therefore overrule petitioner's exception to the referee's finding in this regard.

■ Even after finding Nordstrom did not discuss the case prior to trial, however, we are still left with her concealment—found by the referee—of her knowledge of the case. Respondent argues that even if such concealment

---

[4]Respondent claims Robinson was unbelievable for two reasons. First, her "testimony about Nordstrom's expression of opinion was so conclusory as to be legally insubstantial." Second, "Robinson did not delineate the content of those expressions, indicate the number of times Nordstrom made them, or describe the circumstances in which they were made."

Respondent's arguments are not supported by the record. Robinson testified unequivocally that prior to the trial, Nordstrom, like the other bank employees, expressed the belief that petitioner was guilty of the charged crimes. The fact that Robinson did not provide additional details of the conversations, or recount the number of times Nordstrom made such comments, is not particularly significant because she was never asked to provide additional details by either petitioner or respondent.

occurred, it was not serious enough to constitute grounds for relief. Specifically, he contends *Diaz, supra*, 152 Cal.App.3d 926, and *Blackwell, supra*, 191 Cal.App.3d 925, which granted relief for similar juror misconduct based on concealment during voir dire, were incorrectly decided. Instead, respondent argues that to constitute misconduct, a venireperson's failure to accurately respond to a question on voir dire must be (i) intentional and not merely inadvertent, and (ii) involve a material point. (See *People* v. *Kelly* (1986) 185 Cal.App.3d 118, 125-128 [229 Cal.Rptr. 584] [disagreeing with *Diaz*]; *People* v. *Jackson* (1985) 168 Cal.App.3d 700, 704-706 [214 Cal.Rptr. 346] [same].) Requiring an intentional concealment, respondent argues, properly balances the People's interest in the finality of criminal judgments with the defendant's right to a fair trial.[5]

As in *Weathers* v. *Kaiser Foundation Hospitals, supra,* 5 Cal.3d 98, we need not resolve whether juror concealment must be intentional before it constitutes misconduct *(id.* at p. 110, fn. 5), because the record clearly

---

[5]The federal rule falls somewhere between the positions of petitioner and respondent. Thus, in *McDonough Power Equipment, Inc.* v. *Greenwood, supra*, 464 U.S. 548, a plurality of the United States Supreme Court, per Justice Rehnquist, held that a "juror's mistaken, though honest, response to a [voir dire] question" *(id.* at p. 555 [78 L.Ed.2d at pp. 670-671]) does not justify the granting of a new trial. Instead, in order to gain a new trial, "a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause." *(Id.* at p. 556 [78 L.Ed.2d at pp. 671-672] (plur. opn. of Rehnquist, J.).)

Justice Blackmun, joined by Justices Stevens and O'Connor, concurred, explaining that "in most cases, the honesty or dishonesty of a juror's response is the best initial indicator of whether the juror in fact was impartial." (464 U.S. 548, 556 [78 L.Ed.2d 663, 671-672] (conc. opn. of Blackmun, J.).) He went on, however, to state that "regardless of whether a juror's answer is honest or dishonest, it remains within a trial court's option, in determining whether a jury was biased, to order a post-trial hearing at which the movant has the opportunity to demonstrate actual bias or, in exceptional circumstances, that the facts are such that bias is to be inferred." *(Id.* at pp. 556-557 [78 L.Ed.2d at pp. 671-672].) Thus, the three justices would not join the plurality's strict requirement that a potential juror answer dishonestly, and that any resulting bias must constitute a basis for a challenge for cause. Instead, the three justices simply focussed on whether the juror was biased.

Similarly, Justice Brennan, joined by Justice Marshall, wrote separately and declined to join the plurality's strict approach. Instead, "the proper focus . . . should be on the bias of the juror and the resulting prejudice to the litigant. More specifically, to be awarded a new trial, a litigant should be required to demonstrate that the juror incorrectly responded to a material question on *voir dire*, and that, under the facts and circumstances surrounding the particular case, the juror was biased against the moving litigant." (464 U.S. 548, 557-558 [78 L.Ed.2d 663, 672-673] (conc. opn. of Brennan, J.).) In Justice Brennan's view, whether the juror's answer on voir dire was intentional or not was simply a factor the trial court should consider in determining whether the juror was actually biased. *(Id.* at p. 558 [78 L.Ed.2d at pp. 672-673].)

In sum, five justices declined to hold that a litigant must show a juror answered dishonestly a voir dire question before being entitled to relief, and would instead focus on the totality of the circumstances to determine whether the juror was biased on a material issue.

reveals that Nordstrom's concealment was intentional. In her jury questionnaire, Nordstrom disavowed any knowledge about petitioner's case. At the evidentiary hearing before the referee, she continued to assert she had had no knowledge of petitioner's case. These protestations of ignorance were strongly contradicted by the witnesses who testified before the referee. The referee clearly credited this latter testimony, finding that Nordstrom "had greater knowledge of this case than she revealed on voir dire [and that she] at least overheard conversations regarding the double homicide . . . prior to her selection as a juror." There is substantial evidence to support this factual finding.

Significantly, Nordstrom did not claim, either on voir dire or at the evidentiary hearing, that she in good faith could not remember anything about petitioner's trial, or that she gave an unintentionally incorrect answer. (See *MacColl* v. *L.A. Met. Transit Auth.* (1966) 239 Cal.App.2d 302, 306 [48 Cal.Rptr. 662].) Moreover, the questions on voir dire clearly and fairly asked her to reveal the extent of her knowledge about the case. (See *People* ex rel. *Dept. Pub. Wks.* v. *Curtis* (1967) 255 Cal.App.2d 378, 389 [63 Cal.Rptr. 138] ["The questions propounded . . . fairly called for such disclosure."].) Under these circumstances, it may reasonably be inferred that Nordstrom's failure to reveal the depth of her knowledge about petitioner's case was not inadvertent, but was instead intentional.

Although respondent contested the materiality of Nordstrom's omission in his informal opposition to the petition for a writ of habeas corpus, he does not raise that challenge in his brief on the merits. In any event, Nordstrom's concealment of her knowledge of the case was unquestionably a material issue on voir dire. Indeed, the record shows the prospective jurors' prior knowledge of the case was of critical importance to defense counsel. We thus conclude the information concealed by Nordstrom was sufficiently material and presents no obstacle to finding misconduct which, if the presumption of prejudice is unrebutted, will result in reversal.

In sum, because the evidence reveals Nordstrom intentionally concealed material information on voir dire, we conclude she committed misconduct.

### 2. *Nordstrom's Midtrial Conversations With Robinson*

We also directed the referee to determine whether Nordstrom discussed the case with her coworkers while still a sitting juror in petitioner's case. The record of the evidentiary hearing shows that Robinson testified as follows:

"Q [by Mr. Ingram, counsel for petitioner]: Do you know if these conversations [at Frankie's Champagne Palace] took place before the case had actually gone to the jury? A: Yes, it did.

"Q: And before they decided his guilt? A: Yes.

". . . . . . . . . . . . . . . . . . . . . . . . . . .

"Q: . . . Do you remember any incident in particular? A: Yes, I remember one incident when we were out having a drink.

"Q: Can you describe that incident? A: . . . [S]he told me that [petitioner] deserved to be taken out, strung up or lynched up. He—he needed to have his—be sexually abused, cut up, and I couldn't—asked her what she was saying, and she said, that, um, she felt an eye for an eye, tooth for a tooth, and that's what happened to these people, so he deserved it, too.

"Q: And you're sure that this occurred prior to the case actually being decided? A: Um, the incident was such a big ordeal for me to hear her say this, that I know it was two or three weeks before [the case was decided]."

On redirect examination, Robinson reiterated that she was sure the incident occurred prior to the conclusion of the trial, and that Nordstrom advocated castration as an appropriate penalty for petitioner. (Although some of victim Rebecca Jensen's clothes, including her underpants, had been torn off, there was no evidence of a sexual assault, and petitioner was not convicted of any sexual offenses.)

By contrast, when asked whether she discussed the case with Robinson during trial, Nordstrom flatly asserted, "I did not discuss this case with anybody during the trial."

The referee found that Robinson was the more believable witness on this point and concluded "that the conversations did take place at Frankie's Champagne Palace during the guilt phase of the trial." The referee's factual finding on this point is well supported by the record and we therefore adopt it. Inasmuch as the referee clearly credited Robinson's account over Nordstrom, we assume the referee found the discussions took place as described by Robinson. We thus reject respondent's argument that the referee never found that Nordstrom "in fact made such vitriolic statements."

We also reject respondent's further claim that a single out-of-court conversation by a juror does not necessarily affect the juror's ability or impartiality. In support, respondent cites *People* v. *Keenan* (1988) 46 Cal.3d 478, 539-542 [250 Cal.Rptr. 550, 758 P.2d 1081], which concerned the entirely distinguishable situation of one juror losing patience and threatening *another juror*. By contrast, this case involves a sitting juror conversing about the case with *a nonjuror*. Thus, *Keenan, supra*, is inapposite to the facts of this case.

The Penal Code provides that jurors must not "converse among themselves or with anyone else on any subject connected with the trial, or to form or express any opinion thereon until the cause is finally submitted to them." (§ 1122.) Petitioner's jury was so instructed.[6] Violation of this duty is serious misconduct. (*People* v. *Pierce* (1979) 24 Cal.3d 199, 207 [155 Cal.Rptr. 657, 595 P.2d 91] [sitting juror committed misconduct when he spoke to his neighbor, a police officer, about the case; conviction reversed].) We conclude Nordstrom's midtrial conversations with Robinson about petitioner's case constituted a second, separate instance of juror misconduct. This misconduct also raises a presumption of prejudice.

### B. *Resulting Prejudice/Prejudgment*

A summary of the referee's factual findings (and logical inferences drawn therefrom) thus far will help clarify the analysis. In essence, the referee found that: (i) Nordstrom was untruthful in her responses to the jury questionnaire and on voir dire concerning the fact and scope of her pretrial knowledge of petitioner's case, (ii) she continued to lie at the evidentiary hearing about the scope of her pretrial knowledge of the case, (iii) she violated her oath as a juror by discussing the case with nonjurors before the trial was over, and (iv) she lied about having discussed the case with nonjurors.

■ As a general rule, juror misconduct "raises a presumption of prejudice that may be rebutted by proof that no prejudice actually resulted." (*People* v. *Cooper* (1991) 53 Cal.3d 771, 835 [281 Cal.Rptr. 90, 809 P.2d 865]; *People* v. *Holloway* (1990) 50 Cal.3d 1098, 1108 [269 Cal.Rptr. 530, 790 P.2d 1327].) Thus, "[a] judgment adverse to a defendant in a criminal case must be reversed or vacated 'whenever . . . the court finds a substantial likelihood that the vote of one or more jurors was influenced by exposure to prejudicial matter relating to the defendant or to the case itself that was not part of the trial record on which the case was submitted to the jury.' (2 ABA Standards for Criminal Justice, std. 8-3.7 (2d ed. 1980) p. 8.57; . . .) [¶] 'The ultimate issue of influence on the juror is resolved by reference to the substantial likelihood test, an objective standard. In effect, the court must examine the extrajudicial material and then judge whether it is inherently likely to have influenced the juror.' (2 ABA Standards for Criminal Justice, *supra*, std. 8-3.7, Commentary, p. 8.58.)" (*People* v. *Marshall* (1990) 50

---

[6]Petitioner's jury was admonished "that it is your duty not to converse amongst yourselves *or with anyone else* on any subject connected with this trial, and you're not to form *or express any opinion* on this case until the case has finally been submitted to you after you're given further instructions on the law and you have retired to the jury room to . . . deliberate." (Italics added.) The parties then stipulated that the jury was deemed to be fully admonished following every adjournment "whether or not the admonition is repeated in full."

Cal.3d 907, 950-951 [269 Cal.Rptr. 269, 790 P.2d 676]; see also *People* v. *Holloway, supra* at pp. 1109-1110.)

■ The rule applies to both types of misconduct present in this case. Thus, juror misconduct involving the concealment of material information on voir dire raises the presumption of prejudice (*Wiley* v. *Southern Pacific Transportation Co.* (1990) 220 Cal.App.3d 177, 189 [269 Cal.Rptr. 240] [applying the presumption of prejudice standard in case involving concealment on voir dire]; *Blackwell, supra* 191 Cal.App.3d 925, 929 [same]; *Diaz, supra*, 152 Cal.App.3d 926, 934-935 [same]), as does the misconduct of discussing the case with nonjurors while the case is pending (*People* v. *Pierce, supra*, 24 Cal.3d at p. 207; see *People* v. *Honeycutt* (1977) 20 Cal.3d 150, 156 [141 Cal.Rptr. 698, 570 P.2d 1050] ["It is well settled that a presumption of prejudice arises from *any* juror misconduct." (Italics added.)]).

This presumption of prejudice " 'may be rebutted by an affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party [resulting from the misconduct]. . . .' " (*People* v. *Miranda* (1987) 44 Cal.3d 57, 117 [241 Cal.Rptr. 594, 744 P.2d 1127], quoting *Hasson* v. *Ford Motor Co.* (1982) 32 Cal.3d 388, 417 [185 Cal.Rptr. 654, 650 P.2d 1171]; *Wiley* v. *Southern Pacific Transportation Co., supra*, 220 Cal.App.3d at p. 189.)

■ Respondent argues that even if Nordstrom committed misconduct, the presumption of prejudice is rebutted by other evidence elicited at the reference hearing. ■ Respondent relies heavily on the referee's conclusion that "No credible testimony was received indicating that Cathy Nordstrom had in fact prejudged the defendant's guilt." After a careful examination of the record, however, we conclude the referee's determination that Nordstrom did not prejudge the case is not supported by substantial or credible evidence. Accordingly, we decline to adopt it.

We reach this conclusion for a number of reasons. First, the referee found—and our independent review of the evidence confirms—that Nordstrom intentionally concealed her knowledge of the case. "[I]n most cases, the honesty or dishonesty of a juror's response [to a question on voir dire] is the best initial indicator of whether the juror in fact was impartial." (*McDonough Power Equipment, Inc.* v. *Greenwood, supra*, 464 U.S. at p. 556 [78 L.Ed.2d at pp. 671-672] (conc. opn. of Blackmun, J.).) As we explained, *ante*, at page 115, the record shows Nordstrom's concealment was intentional. Her false answers concerning the depth of her knowledge of the crime

thus provides an initial indication that she may have prejudged petitioner's case.

Moreover, when a juror conceals material information on voir dire, "that information establish[es] substantial grounds for inferring that [the juror] was biased . . . despite . . . protestations to the contrary." (*People* v. *Price* (1991) 1 Cal.4th 324, 400-401 [3 Cal.Rptr.2d 106, 821 P.2d 610] [challenge to trial court's grant of prosecution's challenge for cause].) "Concealment by a potential juror constitutes implied bias justifying disqualification." (*People* v. *Morris* (1991) 53 Cal.3d 152, 183-184 [279 Cal.Rptr. 720, 807 P.2d 949] [same].) Nordstrom's suppression of material information on voir dire thus creates an inference that she prejudged the case.

This initial indication of Nordstrom's partiality is further supported by evidence that she violated her oath as a juror by speaking about the case to Kim Robinson before the trial was over. The evidence shows Nordstrom made midtrial statements to Robinson at Frankie's Champagne Palace that petitioner should be horribly mutilated for his crimes. Significantly, the referee found Nordstrom made these statements, stating that she violated the trial court's admonition not to discuss the case. "When a person violates his oath as a juror, doubt is cast on that person's ability to otherwise perform his duties." (*People* v. *Cooper*, *supra*, 53 Cal.3d at pp. 835-836.)

Although the referee found Robinson's testimony recounting Nordstrom's midtrial statements was generally believable, he also found the statements were not indicative of prejudgment. Instead, the referee found that "the most that can be said for the discussions is that Ms. Nordstrom was being influenced by the evidence she was hearing and forming impressions thereof and passing those impressions on to Kim Robinson."

We disagree. In essence, *the referee found* that (i) Nordstrom was untruthful in her jury questionnaire and on voir dire concerning the scope of her pretrial knowledge about petitioner's case, (ii) she violated her oath as a juror by discussing the case with nonjurors before the trial was over, (iii) she continued to lie at the evidentiary hearing about the scope of her pretrial knowledge of the case, and (iv) she lied at the evidentiary hearing about having discussed the case with Robinson. Under these circumstances, the referee's conclusion that Nordstrom's vitriolic statements were nothing more

than "forming impressions about the evidence" is not supported by substantial evidence. Instead, it appears "reasonably probable" Nordstrom had prejudged the case. (*People* v. *Miranda, supra,* 44 Cal.3d at p. 117.)[7]

Respondent urges a contrary conclusion, claiming the referee was entitled to conclude Nordstrom did not prejudge the case based on the fact that she was one of the last jurors to vote for guilt. The record shows that Nordstrom executed a declaration on February 26, 1990, in which she states, "I was one of the last two jurors to join in the verdict of guilt." When asked about the declaration at the evidentiary hearing on April 22, 1991, however, she was unsure. The record shows the following colloquy:

"Q [by Mr. Ingram]: Do you remember signing anything in front of Mr. Reynolds [from the district attorney's office]? A: Actually, I believe I—he was recording the conversation.

"Q: Okay. A: I don't believe I signed anything. I believe that was with the District Attorney's Office.

"Q: Okay. Did you remember putting in this declaration that you were one of the last two jurors to vote for guilt? A: I don't believe that that's—it may have—*I may have said that. In the case, it wasn't the guilt of Mr. Hitchings, it was the penalty phase that I had problems with.*

"Q: Okay. So you were not one of the last two to vote for guilt? A: *I may have been one of the last two,* but I still felt that he was guilty.

"Q: Okay. Do you remember telling Mr. Reynolds that—that, in fact, you were not one of the last two in regards to the guilt phase? A: *Like I said, I'm not sure on that.* I do know that I believe the man was guilty . . . ." (Italics added.)

After her equivocation, the district attorney revisited the subject on cross-examination:

"Q: During the guilt phase or the first phase, were you not one of the last jurors to vote for guilty? A: *I've done some thinking about it. I think I was close to the last one—one of the last ones.*" (Italics added.)

She reiterated this point on redirect examination.

Petitioner challenges the referee's finding in this regard. His challenge is twofold. First, he contends the evidence supporting the finding is not worthy

[7]By so concluding, we necessarily hold that petitioner's formal exception to the referee's finding in this regard is well taken.

of belief. Second, he asserts such a finding violates Evidence Code section 1150. We need not reach either point, for assuming the evidence was admissible, relevant, and worthy of belief, we conclude the evidence was simply too ambiguous to be probative. Accordingly, such evidence cannot constitute substantial evidence to support the referee's conclusion that Nordstrom did not prejudge the case.

Respondent would have us draw from the fact that Nordstrom was one of the last jurors to vote for guilt the inference that she had not prejudged the case. Even assuming for argument that Nordstrom was one of the last jurors to vote for guilt, that "fact" is too tenuous a foundation to support respondent's inference. Nordstrom may simply have been the last juror as the foreperson went around the table for votes. Some other order of casting votes may have been used under which Nordstrom was last. She might have asked to vote last to conceal her prejudgment of the issues. There are many possible scenarios that could explain Nordstrom being the last (or one of the last) jurors to vote for guilt. Under the circumstances, we conclude that "fact" cannot constitute substantial evidence to support the referee's conclusion that Nordstrom did not prejudge the case.[8]

In the absence of any substantial evidence that Nordstrom was one of the last to vote for guilt, the referee's ultimate conclusion that she did not prejudge the case lacks reasonable support in the record. We reiterate that this court will independently review the evidence, and is not bound by a referee's factual findings. A referee's findings are entitled to judicial deference only when they are supported by "ample, credible evidence" or "substantial evidence." (*People* v. *Ledesma, supra*, 43 Cal.3d at p. 219.) The referee's finding regarding Nordstrom's lack of prejudgment is not supported by such evidence. Accordingly, we sustain petitioner's exception to the referee's finding on this point, and conclude there was no substantial evidence to support the referee's decision that Nordstrom did not prejudge the case. It necessarily follows that respondent has not rebutted the presumption of prejudice that arises from both (i) Nordstrom's concealment of material information on voir dire, and (ii) her violation of her oath by speaking to Robinson about the case while a sitting juror.

---

[8]Because we find the evidence of the timing of Nordstrom's guilty vote too ambiguous to be probative, we need not decide whether the issue was waived by petitioner's failure to object on this ground at the evidentiary hearing. (Cf. *People* ex rel. *Dept. Pub. Wks.* v. *Curtis, supra*, 255 Cal.App.2d at p. 391 [incompetence of juror to impeach verdict waived by failure to object]; *People* v. *Black* (1963) 216 Cal.App.2d 103, 115 [30 Cal.Rptr. 798] [same]; *People* v. *Hill* (1992) 3 Cal.App.4th 16, 43-45 [4 Cal.Rptr.2d 258] (conc. and dis. opn. of Nicholson, J.) [failure to renew motion to strike waived Evid. Code, § 1150 objection].)

## Conclusion

We conclude Nordstrom's intentional concealment on voir dire of material information, as well as her discussing the case with Kim Robinson while a sitting juror, constituted jury misconduct and raised a presumption of prejudice that stands unrebutted by the evidence presented at the evidentiary hearing.[9] The petition for a writ of habeas corpus is therefore granted, the judgment of conviction vacated, and petitioner remanded to the Superior Court of Humboldt County. Upon finality, the clerk shall remit a certified copy of this opinion and order to the superior court for filing, and respondent shall serve another copy thereof on the prosecuting attorney in conformity with section 1382, subdivision (b). (See *In re Sixto* (1989) 48 Cal.3d 1247, 1265 [259 Cal.Rptr. 491, 774 P.2d 164]; *In re Hall, supra,* 30 Cal.3d 408, 435, fn. 9.)

Mosk, J., Panelli, J., Kennard, J., Arabian, J., Baxter, J., and George, J., concurred.

Respondent's petition for a rehearing was denied December 30, 1993.

---

[9]In light of this conclusion, we need not address petitioner's further contentions that (i) evidence of Nordstrom's prejudgment requires reversal of the penalty phase judgment even if it does not affect the guilt phase judgment; (ii) the evidentiary hearing was not adequate to vindicate petitioner's constitutional rights; and (iii) the evidence of Nordstrom's concealment should be considered when evaluating the claim—raised on direct appeal—that the trial court erred by denying petitioner's change of venue motion.