Filed 10/23/14  P. v. Velasquez CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D063570 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN297958) |
| LUCIANO VELASQUEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Runston G. Maino, Judge.  Reversed and remanded.

Nancy J. King, under appointment of the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood and Paige B. Hazard, Deputy Attorneys General, for Plaintiff and Respondent.

In this attempted murder case in which the identity of the shooter was the critical factual issue at trial, the jury—after the court twice denied a defense motion to remove

juror No. 9 from the panel and after the jury sent the court a note asking how long it needed to deliberate before it became a hung jury—found Luciano Velasquez guilty of three counts of attempted murder (Pen. Code,[1] §§ 664, 187, subd. (a)). As to all three counts, the jury found Velasquez personally used a firearm (§ 12022.5, subdivision (a)); he committed the offenses for the benefit of, or at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)); he personally inflicted great bodily injury upon each of the three victims—Alejandra Moreno, her brother David Moreno,[2] and Eric G. (Eric)—within the meaning of section 12022.7, subdivision (a)); and he intentionally and personally discharged a firearm which caused great bodily injury (§12022.53, subd. (d)). Velasquez admitted, and the court found true, allegations he had suffered two prior prison terms (§§ 667.5, subd. (b), 668). The court sentenced him to an aggregate prison term of 75 years to life plus 30 years four months.

Velasquez appeals, contending (1) the court violated his constitutional right to an unbiased jury by denying his motion to excuse juror No. 9, who informed the court after she was sworn in that she was personally acquainted with two of the three victims—her former students Alejandra and Eric—who testified on behalf of the prosecution; and (2) the court improperly sustained numerous evidentiary objections by the prosecution during defense cross-examination of witnesses, thereby depriving him of his constitutional rights to confrontation and due process.

---

[1]     Statutory references are to the Penal Code unless otherwise specified.

[2]     As Alejandra Moreno and David Moreno share the same last name, we shall refer to them by the first names. We intend no disrespect.

2

For reasons we shall explain, we conclude the judgment must be reversed and the matter remanded for further proceedings because juror No. 9's failure to disclose her relationship with Alejandra and Eric during voir dire, even if unintentional, was an irregularity that undermined the voir dire process, Velasquez's right to reasonably exercise a peremptory challenge, and thus his Sixth Amendment right to an impartial jury. The court committed reversible error by refusing to discharge juror No. 9 and replace her with one of the alternate jurors. Accordingly, we reverse the judgment and remand the case for further proceedings.

## FACTUAL BACKGROUND

A. *The People's Case*

1. *The shooting incident*

On October 10, 2011, at around 8:00 p.m., Alejandra, her brother, David, and Alejandra's then-16-year-old boyfriend, Eric, were at Alejandra and David's home in Carlsbad when Alejandra and David decided to take a walk with Eric and their two dogs. David planned to walk and Alejandra and Eric would ride bikes. Eric left the house first and walked across the street with his bike and one of the dogs. Shortly thereafter, David walked through the front yard gate and Alejandra followed him to the driveway pushing her bike. Although it was dark outside, it was not pitch black because there was a streetlight across the street and another one closer to a nearby preschool.

A sedan turned onto the street and approached slowly. The car, a dark blue four-door Dodge Stratus, pulled up and stopped. Eric saw five people in the car: the driver and the front passenger were females and the three passengers sitting in the back were

3

males.  The passenger in the rear driver's side seat rolled down the window, reached out through the window, and opened the door from the outside.  The interior light went on when the door opened.  The male exited the car and walked around the back of the car. Eric testified he saw him stuff something in his pocket or the waistband of his pants.  The male approached Alejandra and David, who were still on the driveway.  Eric was still across the street.  The male asked Alejandra and David where they were from, and Alejandra, who had not been involved in gangs, was confused about the question.  She pointed at her house and said that was where she was from.  David, who understood that the male was asking which gang they were affiliated with, replied he was from nowhere.

Eric crossed the street on his bike to see what was going on, and the male appeared startled when Eric approached him.  Eric was concerned because the male had a bandanna covering the lower part of his face, including his mouth.  The male stepped back and asked Eric, "Where the fuck you from?"  Eric told him, "I don't bang," meaning he did not belong to a gang.

After twice asking Eric what he had in his pockets, the male from the car reached into his waistband and pulled out a gun.  Eric testified that the male fired a total of seven rounds from a revolver.  Eric was shot twice in the leg and once in the stomach.  The shooter then turned toward Alejandra and David and fired shots at them.  Alejandra and David were each hit in the leg.  Eric was able to run to Alejandra, pick her up, and carry her inside the house.  David was able to run inside on his own.  The shooter ran back to the car and jumped in, and the car drove away.

2. *The investigation and conflicting evidence of the shooter's identity*

As part of the investigation, police spoke with neighbors and searched for evidence at the scene of the shooting. They found no bullets, no shell casings, no tire marks, and only droplets of blood.

Using the description of the vehicle provided by Eric, Detective Bryan Hargett of the Carlsbad Police Department located a matching Dodge Stratus in Oceanside. A few weeks of surveillance of the car showed that no one used the rear driver's side door. A young child was observed climbing over the driver's seat to get to the driver's side back seat.

The police executed a search warrant to seize and search the Stratus. The child protection lock on the car was activated so that the driver's side back door could not be opened from the inside. A passenger could open the door by rolling down the window and reaching outside to lift the outside door handle. The daughter of the registered owner of the car was dating a member of the Mesa gang. A friend of the owner's daughter was dating Velasquez. No fingerprints or other evidence associated with Velasquez were found in the car.

At trial Eric testified the shooter wore a long-sleeved flannel-type shirt, long pants, a bandanna around his neck and mouth, and a hat, and he had a "filled in" tattoo under his right eye. Eric stated he told the police the tattoo "could possibly be a big teardrop or anything that is filled in." He also told the police that the shooter did not have any facial hair and that he was certain the shooter did not have a mustache. Eric identified Velasquez in court as the shooter. He also stated he had identified Velasquez in a photo

5

lineup and had stated at the time that he was "75 percent sure," but that he was "not sure on tattoos." Detective Hargett indicated at trial that Eric's statement that he was 75 percent sure of his identification was sufficient to support an arrest of Velasquez because the probable cause standard is "more likely than not."

Alejandra's testimony regarding the description of the shooter was not consistent with Eric's. She testified the shooter wore a short-sleeved blue shirt and shorts that only reached his knees, he had a bandanna around his neck that was below his chin and did not cover up any of his facial features, and he was not wearing a cap or anything else on his head. She further testified the shooter had a mustache, "huge" eyes, and "dark things around his eyes." At the time of the shooting she thought those markings probably were tattoos. She did not see any tattoos on the shooter's hands or fingers. Alejandra identified Velasquez in court as the shooter. Indicating she had also identified Velasquez in a photo lineup, Alejandra testified that she "tried to match the eyes, and when [she] looked at him, it was inevitable."

David testified he could not identify the shooter with certainty. He testified he was 10 or 15 feet from the shooter at the time of the incident. The shooter wore a dark long-sleeved shirt and a handkerchief around his neck that went up to the top of his collar, and he had a little mustache. Stating he did not remember looking at the shooter's pants, David testified the shooter had a tattoo under his right eye. David indicated he had not been able to identify Velasquez from a photo lineup. Specifically, he testified, "I identified somebody; I did not say that that was specifically the person." David then testified, "I believe my exact words were "this pretty much looks like the person who shot

6

me, but I don't know if that's exactly him or not." Detective Steven Seapker of the Carlsbad Police Department testified that when he showed David the photo lineup, David did not identify anybody as the shooter.

The prosecution presented evidence that Velasquez was known to Oceanside police as a Mesa gang member, and Velasquez had two tattoos under his eyes: the number "1" under his right eye and a "3" under his left eye. When asked what those tattoos meant, Detective Hargett opined that "1" and "3" is "13," the letter "M" is the 13th letter of the alphabet, and the "1" and "3" could stand for "Mesa." He also testified that having a "13" tattoo could also show an allegiance with the Mexican Mafia, the largest Hispanic prison gang in Southern California that "controls all the street level gangs from the prison." Detective Hargett also testified that Velasquez had "Mesa" tattooed across the back of his head, "Mesa Margarita" across his lower abdomen, "Sur" across his right hand, and three dots representing "mi vida loca" ("my crazy life") symbolizing he had lived a crazy gang life.

Detective Hargett testified he did not know any Carlsbad gang members with similar large eye tattoos, no other Mesa gang member "remotely resemble[d]" Velasquez in appearance or displayed similar tattoos. He also testified a blue bandanna was found in a vehicle in front of a residence where, according to information he had received, Velasquez lived. Detective Hargett opined that the motive for the shooting might have been retaliation for a beating at Carlsbad High School of a Mesa member by Carlsbad rivals. In the days leading up to the shooting, Velasquez was in custody, including during the time that the Mesa member was beaten by Carlsbad gang members. The shooting

7

happened on October 10, 2011, and Velasquez was released on October 5, five days before the shooting.

B. *The Defense*

A prosecution gang expert testified on cross-examination that Velasquez had never been arrested for a violent crime prior to the shooting in this case.

An ophthalmologist who had examined records of eye examinations performed on Velasquez in 2009 and 2010, prior to the 2011 shooting, testified that Velasquez was very nearsighted in each eye and could not see or function very well without "fairly thick" glasses. The doctor opined that Velasquez would not be able to shoot someone standing six to eight feet away. Although Velasquez would be able to see the person's form, the image would be blurred and he might not be able to recognize the person's face.

A private investigator testified that Velasquez was under the control of Mexican Mafia "shot caller[s]" when he was in and out of prison. The investigator opined that it was "absurd" that a gang member associated with the Mexican Mafia would involve himself with retaliation for a high school incident.

The defense also called Detective Hargett, who testified that only Velasquez was charged for the shooting, but the investigation remained ongoing as the police searched to identify the other individuals in the car that night.

DISCUSSION

## I. *FAILURE TO DISCHARGE JUROR NO. 9*

Challenging his conviction of three counts of attempted murder that arose out of the shootings of Alejandra, Eric, and David, Velasquez contends the court violated his

8

constitutional right to an unbiased jury by denying his motion to discharge juror No. 9, who informed the court after she was sworn in that she was personally acquainted with two of the three victims─Alejandra and Eric─who testified on behalf of the prosecution. For reasons we shall explain, we conclude the judgment must be reversed and the matter remanded for further proceedings because (1) juror No. 9's failure to disclose her relationship with Alejandra and Eric during voir dire─whether intentional or inadvertent─was an irregularity that undermined the voir dire process, Velasquez's right to reasonably exercise a peremptory challenge, and his Sixth Amendment right to an impartial jury; and (2) the court committed reversible error by twice denying the defense motion to discharge juror No. 9 and replace her with one of the alternate jurors.

A. *Background*

At the beginning of voir dire, the court informed the prospective jurors that the three alleged victims in this case were "Eric G.[, who] is a minor"; "David Moreno"; and "Alejandra Moreno," who was "also known as Alex Moreno." The court told the prospective jurors that the prosecutor was going to tell them who his witnesses might be. The court then told the prospective jurors, "The purpose of this is to see if you know anybody."

The prosecutor then read aloud the names of witnesses who might testify at the trial, including "Eric G., who is the minor that the Court spoke about"; "Alejandra . . . Moreno", who was "[a]lso known as Alex"; and "[h]er brother, David Moreno."

9

The court then asked the prospective jurors, "Does anybody know either the prosecuting attorney or any of the names that he mentioned?" Prospective juror No. 30 knew one of the potential witnesses. The court then asked, "Anyone else?" When none of the other prospective jurors, including prospective juror No. 9, responded to the court's question, the court stated, "I don't see anybody else."

Prospective juror No. 9 thereafter stated she was a middle school teacher who had served as a juror in three criminal cases. She also stated she had been the victim of a crime 15 or 16 years earlier. She did not indicate that she knew Alejandra Moreno or Eric G., and she told the court she believed she could be impartial.

Twelve jurors, including juror No. 9, and two alternates were thereafter sworn in and seated.

Trial began, the prosecutor gave an opening statement, and during the next break juror No. 9 sent a note to the court stating she might know Alejandra. The court immediately conducted a hearing outside the presence of the other jurors. When the court showed juror No. 9 a photograph of Alejandra, juror No. 9 stated, "I think she's a former student [from] about five, six, seven years ago." The court explained that knowing a witness did not automatically preclude service as a juror, but the "issue would be if your relationship with her was such that it might influence the way you look at her testimony." When the court asked juror No. 9 how she felt about Alejandra, the following exchange took place between juror No. 9 and the court:

> "[JUROR NO. 9]: *I loved her. She was awesome. I knew her for actually several years because she was an avid student of mine.* It was more than one year. It wasn't like she was in my class just once.

10

[¶] She has come back to visit me in the past to say hi, like, 'Hi, [Juror No. 9],' that sort of thing. [¶] I haven't seen her in a few years, but I'm pretty sure that's her. I didn't recognize her when you said 'Alex,' I thought it was a guy, but I'm pretty sure that's her from that side view. [¶] . . .

"THE COURT: Do you feel that knowing her, as you have described, that will make it difficult to look at her testimony as you would any other witness? Remember the instruction I gave you, each witness must be judged by the same standard. And if you can do that, fine. If you can't do that, that's fine, too.

"[JUROR NO. 9]: Well, I mean, I think that she could—I mean, anybody could make a mistake, I mean, but I feel like, since I know her, I mean, I know that she—*I believe that I would probably think that she wasn't lying or anything like that, so I would be pretty disposed to believe her in certain situations, but recognition is a different thing*—" (Italics added.)

To verify the relationship, the court brought Alejandra into the courtroom.

Alejandra recognized juror No. 9 and said, "Oh, hi." After Alejandra left the courtroom,

the following exchange took place as the court addressed the potential for bias:

"THE COURT: Do you think you could really give [defense counsel] Ms. Lacher and her client a fair shot, knowing how well you know Alejandra?

"[JUROR NO. 9]: I was sitting outside thinking about that. One side of me *I would tend to believe her because I know her and I know she has never been dishonest with me*, but the other part of me *I want to believe that I could be fair*, because sometimes I will have two kids that are good kids and they have disagreements, and I have to still decide which one is telling the truth. So I am put in those situations more often than I want to.

"THE COURT: Even though you don't think Alejandra would lie to you, are you open to the possibility that Alejandra could be completely mistaken?

"[JUROR NO. 9]: Yeah, sure. Sure." (Italics added.)

11

The following exchange then took place between the court and the prosecutor:

"THE COURT: I will tell you what we ought to do, is this: Unless counsel wants to see me at sidebar first, why don't I exclude [juror No. 9] right now and let's talk about it outside of her presence to see if we should keep [juror No. 9] or not?

"[PROSECUTOR]: Could we have an opportunity to inquire of the juror, as well.

THE COURT: All right. I will. It is not normal, but if the defense doesn't object. But let's see if the defense has any questions you would like to ask. [¶] Mr. Prosecutor?"

The court then provided each of the attorneys an opportunity to question juror No.

9:

"[PROSECUTOR]: [Juror No. 9], as a teacher, again, the situation in which you are placed now is really you would have the opportunity to judge credibility and maybe be questioned by Ms. Lacher or other people, or if I have to impeach her. Can you put yourself, again as a teacher, in the role as a professional, a professional juror, and make that hard call, even if you have to see [Alejandra] some other time? You know, will you feel bad about it if you have to vote not guilty—

"[JUROR NO. 9]: No.

"[PROSECUTOR]: —or don't believe her testimony is credible enough?

"[JUROR NO. 9]: No. No, I wouldn't feel bad about it. Justice has to be done. I mean, truly, if she has made a mistake, then she has made a mistake, and the right person should be held responsible for it. But I don't think she would be angry at me. I mean, she might be disappointed, but I don't see her regularly, and I don't have much contact with her, but, I mean, I would of course want her to get justice.

"[PROSECUTOR]: So on a less grand scale than what we're dealing with here, you like her, she is nice—

"[JUROR NO. 9]: Yeah.

12

"[PROSECUTOR]: —she's a good kid, but if she turned in—she tanks a test and gets a 55.

"[JUROR NO. 9]: She still gets an F.

"[PROSECUTOR]: You would still give her an F?

"[JUROR NO. 9]: Yeah.

"[PROSECUTOR]: And you can do that with her testimony?

"[JUROR NO. 9]: Yes. [¶] . . . [¶] And I'm sorry I didn't recognize her name. I'm sorry about that."

Defense counsel chose not to question juror No. 9.

1. *Defense motion to discharge juror No. 9*

After juror No. 9 left the courtroom, the court asked defense counsel her opinion as to whether juror No. 9 should remain on the panel. Defense counsel asked that juror No. 9 be discharged:

> "[DEFENSE COUNSEL]: Although I think that [juror No. 9] wants to really try really hard, I think that she would really like to think that she can be fair, and I think in light of the really close relationship that she has, although they can't say close like they see each other all the time on a daily basis, but it sounds like it's a pretty close relationship.
>
> "And you saw the reaction of Alejandra when she walked in, 'Oh, hi.'
>
> "I just think it would be kind of difficult and hit pretty close to home if there was a call where it comes down to we're not really sure if she made the right recognition or not. And she knows [Alejandra], knows she wouldn't lie, she might have a harder time—the juror might have a harder time saying that she thought [Alejandra] was incorrect. [¶] And so I think that as much as [juror No. 9] would like to stay and I would like to have her stay, I think that she shouldn't."

13

The prosecutor opposed defense counsel's request to excuse juror No. 9, asserting that juror No. 9 and Alejandra "[were] not peers," they did not owe loyalty to one another, and their relationship was "one that still guarantees [Velasquez] a fair trial."

The court then inquired of defense counsel whether the defense was that "these witnesses are lying about your client, or that they are just like everybody else, have the capacity to be wrong." Although the court told defense counsel she did not have to answer the question and reveal trial tactics, defense counsel indicated that the defense would be that the identifications were wrong.

a. *Ruling*

The court stated it would not release juror No. 9 "because [it] took from what she said [that] she has no hesitation at all in saying that Alejandra is wrong. If this were an issue of credibility, Alejandra is lying because Alejandra wants to get someone in trouble, I think that would be a completely different situation." The court indicated it would review case law and would consider removing juror No. 9 later "if the case law does not support me." The court invited counsel to provide helpful or relevant case law.

2. *Renewed defense motion to discharge juror No. 9*

The trial resumed and the prosecution called its first witness—Alejandra's boyfriend, Eric—to the stand. Shortly after Eric began testifying, juror No. 9 submitted a second note to the court indicating she also knew Eric. The court excused the jury, with the exception of juror No. 9, and conducted another hearing. Juror No. 9 explained her relationship with Eric:

"[JUROR NO. 9]:  I had him I think in sixth or seventh grade for history, about—almost probably as many years ago.  I don't remember exactly what year I had him.  He was a little guy then.  He was in my classroom.  I don't know him nearly as well as I know Alejandra.  And it has been—actually, at first when he came in, I wasn't sure if it was even him, and then I heard him talk and then I recognized him.  So I don't know him as well.

"THE COURT:  Was there anything that happened during the course of your contact with Eric G. that caused you to form an opinion about his character for telling the truth or not telling the truth or being accurate or inaccurate?  Or he's just a student?

"[JUROR NO. 9]:  No.  Yeah, he's just a student, actually.  I mean, *I don't remember him ever lying*.  There are no disciplinary things that stand out in my mind.  He was just a student, like I said, but I do recognize him."  (Italics added.)

The court allowed defense counsel to question juror No. 9.  Defense counsel asked juror No. 9 whether the fact that she recognized two victims "change[d] [her] mindset" about whether she thought she could be fair to the defense.  Juror No. 9 answered:  "I don't believe so.  I know it looks like it would be because I am familiar with them, and I really don't think it would.  I really truly—I mean, I want justice not just for the kids, but for him, as well.  I don't want him to be convicted of something that he didn't do.  And I don't want any of them to suffer and to—you know, what can I say?"

The prosecutor then asked juror No. 9 whether she would be able to "render a vote of not guilty" if she believed Eric were lying or mistaken about the identification.  Juror No. 9 replied:  "Yeah, I do, I really believe I could.  I don't have much contact with him, anyway.  I mean, I don't think I have even seen him in how many years it has been, but I really think that I could treat him just like any other witness up there.  I really truly believe that."

15

The court then brought in the third victim, David, but juror No. 9 did not recognize him.

After juror No. 9 left the courtroom, defense counsel consulted with Velasquez and then requested that juror No. 9 be discharged. The prosecutor indicated he submitted to the court's judgment.

a. *Ruling*

The court again denied the defense motion to discharge juror No. 9, stating, "I'm not convinced there is any sort of synergistic effect because the juror knows two people."

The court initiated a discussion of the issue again after Alejandra and Eric testified and the jury left the courtroom. Citing *People v. Cochran* (1998) 62 Cal.App.4th 826 and *People v. Wallace* (2008) [44] Cal.4th 1032, the court confirmed its denial of Velasquez's motion to remove juror No. 9 from the panel, stating:

> "And I think it's a discretionary call by the judge. *I must tell you I think most judges would excuse this juror*, but that's the way they'd exercise their discretion. That's not the standard. The standard is if I so deviated from reasonableness that it's an abuse of discretion. And I think I've made the right call, but if you find a case, let me know." (Italics added.)

C. *Legal Principles*

"[O]ne accused of a crime has a constitutional right to a trial by impartial jurors." (*In re Hitchings* (1993) 6 Cal.4th 97, 110; U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 16.)

"The impartiality of prospective jurors is explored at the preliminary proceeding known as voir dire." (*In re Hitchings, supra*, 6 Cal.4th at p. 110.) The United States

16

Supreme Court has explained that "[v]oir dire plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored. Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled. [Citation.] Similarly, lack of adequate *voir dire* impairs the defendant's right to exercise peremptory challenges where provided by statute or rule . . . ." (*Rosales-Lopez v. United States* (1981) 451 U.S. 182, 188.)

The California Supreme Court has explained that "the efficacy of voir dire is dependent on prospective jurors answering truthfully when questioned." (*In re Hitchings*, *supra*, 6 Cal.4th at p. 110.) "'*Voir dire* examination serves to protect [a criminal defendant's right to a fair trial] by exposing possible biases, both known and unknown, on the part of potential jurors. Demonstrated bias in the responses to questions on voir dire may result in a juror's being excused for cause; hints of bias not sufficient to warrant challenge for cause may assist parties in exercising their peremptory challenges. The necessity of truthful answers by prospective jurors if this process is to serve its purpose is obvious.'" (*Id*. at pp. 110-111, quoting *McDonough Power Equipment, Inc. v. Greenwood* (1984) 464 U.S. 548, 554.)

Thus, "[a] juror who conceals relevant facts or gives false answers during the voir dire examination . . . undermines the jury selection process and commits misconduct" (*In re Hitchings, supra,* 6 Cal.4th at p. 111) because "[s]uch false answers or concealment on voir dire . . . eviscerate a party's statutory right to exercise a peremptory challenge and remove a prospective juror the party believes cannot be fair and impartial." (*Ibid.*)

17

Quoting this court's majority opinion in *People v. Diaz* (1984) 152 Cal.App.3d 926, 932 (*Diaz*), the *In re Hitchings* court explained that "'[j]uror concealment, *regardless whether intentional*, to questions bearing a substantial likelihood of uncovering a strong potential of juror bias, undermines the peremptory challenge process just as effectively as improper judicial restrictions upon the exercise of voir dire by trial counsel seeking knowledge to intelligently exercise peremptory challenges.'" (*In re Hitchings, supra,* at pp. 111-112, italics added.) Again quoting *Diaz*, our high state court further explained that "'[t]he denial of the right to reasonably exercise a peremptory challenge, be it by either the trial court or a juror through concealing material facts, is not a mere matter of procedure, but the deprivation of an absolute and substantial right historically designed as one of the chief safeguards of a defendant against an unlawful conviction.'" (*In re Hitchings*, at p. 112, italics omitted, quoting *Diaz*, at p. 933.)

1. *Section 1089 and the "demonstrable reality" standard of review*

Section 1089,[3] which sets forth the procedure for removing a sitting juror, "authorizes the trial court to discharge a juror at any time before or after the final submission of the case to the jury if, upon good cause, the juror is 'found to be unable to perform his or her duty.'" (*People v. Bennett* (2009) 45 Cal.4th 577, 621.) "A juror who

---

[3] Section 1089 provides in part: "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged and draw the name of an alternate, who shall then take a place in the jury box, and be subject to the same rules and regulations as though the alternate juror had been selected as one of the original jurors."

is actually biased is unable to perform the duty to fairly deliberate and thus is subject to discharge." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1051.)

"'Once a trial court is put on notice that good cause to discharge a juror may exist, it is the court's duty "to make whatever inquiry is reasonably necessary" to determine whether the juror should be discharged.'" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1029.) The decision to retain or remove a juror under section 1089 "is committed to the discretion of the trial court." (*People v. Thompson* (2010) 49 Cal.4th 79, 137.)

However, "an appellate court's review of the decision to remove a seated juror is not conducted under the typical abuse of discretion standard, but rather under the 'demonstrable reality' test." (*People v. Fuiava* (2012) 53 Cal.4th 622, 711 (*Fuiava*).) In *Fuiava*, the California Supreme Court explained that "[t]he typical abuse of discretion standard involves an analysis of whether the trial court's decision is supported by '"substantial evidence"' and 'has been characterized as a "deferential" standard.'" (*Ibid.*) Under this deferential standard, "'[e]ven when there is a significant amount of countervailing evidence, the testimony of a single witness that satisfies the standard is sufficient to uphold the finding.'" (*Ibid.*)

*Fuiava* further explained that, "[i]n contrast, '[t]he demonstrable reality test entails a more comprehensive and *less deferential review*. It requires a showing that the court as trier of fact did rely on evidence that, in light of the entire record, supports its conclusion that bias was established. It is important to make clear that a reviewing court does not reweigh the evidence under either test. Under the demonstrable reality standard, however, the reviewing court must be confident that the trial court's conclusion is

19

*manifestly supported by evidence on which the court actually relied.* [¶] In reaching that conclusion, the reviewing panel will consider not just the evidence itself, but also the record of reasons the court provides.'" (*Fuiava, supra*, 53 Cal.4th at p. 712, original italics omitted, italics added.) The "heightened" and "more stringent" (*People v. Barnwell, supra*, 41 Cal.4th at p. 1052)demonstrable reality standard that governs appellate review of a trial court's decision to retain or remove a sitting juror under section 1089 "more fully reflects an appellate court's obligation to protect a defendant's fundamental rights to due process and to a fair trial by an unbiased jury." (*Ibid.*)

"'Although intentional concealment of material information by a potential juror may constitute implied bias justifying his or her disqualification or removal [citations], mere inadvertent or unintentional failures to disclose are not accorded the same effect. "[T]he proper test to be applied to unintentional 'concealment' is whether the juror is sufficiently biased to constitute good cause for the court to find under Penal Code sections 1089 and [former] 1123 that he is unable to perform his duty."'" (*People v. Wilson* (2008) 44 Cal.4th 758, 823 (*Wilson*).)

"'Except *where bias is clearly apparent from the record*, the trial judge is in the best position to assess the state of mind of a juror or potential juror on voir dire examination.'" (*People v. San Nicolas* (2004) 34 Cal.4th 614, 644, quoting *People v. McPeters* (1992) 2 Cal.4th 1148, 1175, italics added.)

D. *Analysis*

We begin our analysis by noting that the critical factual question at trial—the identity of the shooter—was a close issue the jury had difficulty resolving. As discussed

more fully in the factual background, *ante*, police investigators found no forensic evidence at the shooting scene in front of Alejandra and David's residence or in the Dodge Stratus later searched by the police that would circumstantially incriminate Velasquez, and the direct evidence that had any tendency to tie him to the scene as the shooter was the testimony of the three victims: Alejandra, Eric, and David. However, their descriptions of the shooter were inconsistent in significant respects. Depending on which victim was testifying, the shooter had no facial hair (according to Eric) or had a mustache (according to Alejandra); he wore a long-sleeved shirt (according to Eric and David) or a short-sleeved shirt (according to Alejandra); he wore long pants (according to Eric) or shorts that only reached his knees (according to Alejandra); he wore a hat (according to Eric) or he did not wear anything on his head; he wore a bandanna around his neck that did not cover up any of his facial features (according to Alejandra and David) or he wore a handkerchief around his neck and mouth (according to Eric); and he had a "filled in" tattoo under his right or left eye that could have been a big teardrop (according to Eric) or he had "dark things around his eyes" that probably were tattoos (according to Alejandra).[4] David was not able to identify Velasquez as the shooter from a photo lineup.

The jury began its deliberations on November 7, 2012. The jury's difficulty in deciding whether Velasquez was the shooter is evidenced by the fact that, the next day, the jury sent the court a note asking for "Eric/Alex/David['s] description [of the] shooter

---

4    As noted, *ante*, the prosecution's evidence shows Velasquez has two tattoos under his eyes: the number "1" under his right eye and a "3" under his left eye.

up to [the] point of pointing to [the] shooter in the courtroom and identifying the defendant as the suspect," and then sent another note (jury note No. 7) asking, "*How long do we keep deliberating until we get to a hung jury?*" (Italics added.) In its written response to jury note No. 7, the court stated: "As to Note 7, the Court will take no action at this time. If you feel you are unable to resolve the case, please let us know." The court reporter read back to the jury about 100 pages of testimony, and the jury reached its verdicts on November 9.

As discussed, *ante*, the California Supreme Court has explained that a juror who intentionally or inadvertently gives false answers or conceals relevant facts during voir dire examination undermines the jury selection process because "[s]uch false answers or concealment . . . eviscerate a party's statutory right to exercise a peremptory challenge and remove a prospective juror the party believes cannot be fair and impartial." (*In re Hitchings, supra*, 6 Cal.4th at p. 111.) This court explained in *Diaz* that "[a] juror's concealment, *regardless whether intentional*, during voir dire examination of a state of mind which would prevent a person from acting impartially is misconduct constituting an *irregularity* for which new trial may be granted." (*Diaz, supra*, 152 Cal.App.3d at p. 934, italics added.)

Here, juror No. 9's failure to disclose during voir dire that Alejandra—the prosecution witness whose identification of Velasquez as the shooter was the strongest—was one of her former students with whom she had had a close and loving personal relationship, was an irregularity that undermined the voir dire process, Velasquez's right to reasonably exercise a peremptory challenge, and his Sixth

22

Amendment right to an impartial jury. Her failure to disclose this material information, if intentional, would have justified her disqualification or removal. (*Wilson, supra,* 44 Cal.4th at p. 823 ["'[I]ntentional concealment of material information by a potential juror may constitute implied bias justifying . . . her disqualification or removal.'"].)

Although the parties appear to agree that juror No. 9's failure to disclose during voir dire the nature of her relationship with Alejandra was inadvertent, the record is not clear on this point. Juror No. 9 ultimately did inform the court, outside the presence of the other jurors following the prosecutor's reported but not transcribed opening statement, that Alejandra was one of her former students. Juror No. 9 told the court she "didn't recognize" Alejandra during voir dire because the court had referred to Alejandra as "Alex" and she (juror No. 9) "thought it was a guy."

However, the record shows the court twice informed the prospective jurors at the beginning of the voir dire process that one of the three victims in this case was "Alejandra Moreno," and it also told them Alejandra was "also known as Alex Moreno." Thus, the record shows that, although the court referred to Alejandra once by her nickname, "Alex," it twice identified her by her full name, "Alejandra Moreno." The court told the prospective jurors that "[t]he purpose of this is to see if you know anybody." The prosecutor also read aloud the names of the three victims, including Alejandra's full name. It is not clear from the foregoing record how juror No. 9 could have believed during her voir dire examination that a witness identified three times as "Alejandra Moreno"—a name with which juror No. 9 was familiar, as she later revealed following the prosecutor's opening statement—was "a guy."

23

Regardless of whether juror No. 9's failure to disclose during voir dire her relationship with Alejandra was intentional or inadvertent, it was an irregularity in the proceeding that had the effect of "eviscerat[ing] [Velasquez's] statutory right to exercise a peremptory challenge and remove a prospective juror the party believes cannot be fair and impartial." (*In re Hitchings, supra*, 6 Cal.4th at p. 111.) It is likely the defense would have exercised a peremptory challenge to excuse juror No. 9 during voir dire had she revealed at that time that she had had a close and loving personal relationship with Alejandra. We note the defense was also entitled to know during voir dire that a second victim in this case—Eric—was also a former student of juror No. 9. Juror No. 9's failure to disclose this latter information was undoubtedly unintentional because Eric was a minor, both the court and the prosecutor told the prospective jurors his name was "Eric G.," and juror No. 9 likely did not recognize "Eric G." as her former student because neither the court nor the prosecutor disclosed his surname. Nevertheless, the defense was entitled to know during the jury selection process that juror No. 9 had had prior personal relationships with two of the prosecution's three complaining witnesses so that defense counsel could intelligently assist in the protection of Velasquez's Sixth Amendment right to an impartial jury through examination of juror No. 9 regarding those relationships and, if warranted, through the informed exercise of either a challenge for cause or a peremptory challenge.

However, by the time juror No. 9 revealed her previous close personal relationship with Alejandra, juror No. 9 was a sitting juror and Velasquez no longer had an opportunity to remove her through the exercise of a peremptory challenge. The defense

24

responded to juror No. 9's belated disclosure by moving for her discharge, and the court denied that motion, relying on juror No. 9's answers (discussed, *ante*) to questioning by the court and the prosecutor.

Assuming without deciding that juror No. 9's failure to disclose during voir dire both the fact and the nature of her relationship with Alejandra was inadvertent or unintentional, the discharge of juror No. 9 after she was seated on the panel required a showing by the defense that she was "sufficiently biased to constitute good cause" for the court to find under section 1089 that she was unable to perform her duty. (*Wilson, supra,* 44 Cal.4th at p. 823.)

Applying the "less deferential" demonstrable reality standard of appellate review, as we must (*Fuiava, supra,* 53 Cal.4th at p. 711), we conclude the court committed reversible error by denying Velasquez's motion to discharge juror No. 9 following her disclosure of her relationship with Alejandra because the court's finding that juror No. 9 was able to impartially perform her duty was not manifestly supported by the evidence on which the court relied—juror No. 9's own "self-serving statement of impartiality" (*Diaz, supra,* 152 Cal.App.3d at p. 937)—or the case law the court later cited in support of its ruling (*People v. Cochran, supra,* 62 Cal.App.4th 826 & *People v. Wallace, supra,* 44 Cal.4th 1032, discussed, *post*).

Specifically, the record shows that, before the prosecution called its first witness (Eric) and in response to questioning by the court immediately after juror No. 9 looked at a photograph of Alejandra and disclosed that Alejandra was one of her former students, juror No. 9 candidly stated:

25

"I loved her. She was awesome. I knew her for actually several years because she was an avid student of mine."

Juror No. 9 also disclosed that Alejandra had "come back to visit [her] in the past to say hi." When the court brought Alejandra into the courtroom to verify her relationship with juror No. 9, Alejandra immediately recognized juror No. 9 and said, "Oh, hi." After Alejandra left the courtroom, the court asked juror No. 9 whether she could give defense counsel and Velasquez "a fair shot, knowing how well you know Alejandra?" Juror No. 9 candidly replied that " [o]ne side" of her "would *tend to believe* [*Alejandra*] because I know her and I know she has never been dishonest with me." (Italics added.) Indicating some ambivalence about whether she could fulfill her duty to serve as an impartial juror, juror No. 9 then stated, "I want to believe that I could be fair."

Juror No. 9's foregoing candid responses—which she gave before the court granted the prosecutor's request to question Alejandra—established that she was "sufficiently biased to constitute good cause" (*Wilson*, *supra*, 44 Cal.4th at p. 823) for her to be discharged under section 1089 and replaced by one of the alternates. We are mindful that the trial judge is ordinarily "'in the best position to assess the state of mind of a juror.'" (*People v. San Nicolas*, *supra*, 34 Cal.4th at p. 644.) However, as already noted, an exception to this rule applies "'where bias is clearly apparent from the record.'" (*Ibid.*, quoting *People v. McPeters*, *supra*, 2 Cal.4th at p. 1175.)

Here, bias is clearly apparent from the record. Juror No. 9's foregoing responses show that she candidly expressed the love she felt for Alejandra, and she stated that "[o]ne side" of her would "tend to believe [Alejandra]" because she knew Alejandra and

26

she knew Alejandra had never lied to her. As we observed in *Diaz*, bias necessarily must be inferred from surrounding facts and circumstances because "'the bias of a juror will rarely be admitted by the juror himself, "partly because the juror may have an interest in concealing his own bias and partly because the juror may be unaware of it."'" (*Diaz, supra*, 152 Cal.App.3d at p. 937.)

The defense renewed its motion to discharge juror No. 9 when, shortly after Eric began testifying, juror No. 9 submitted a second note to the court indicating she also knew Eric. In response to questioning by the court about her relationship with Eric, juror No. 9 indicated she did not know him as well as she knew Alejandra. However, when the court asked juror No. 9 whether she had formed an opinion about Eric's character for telling the truth or not telling the truth, she answered, "I don't remember him ever lying."

After juror No. 9 again indicated she believed she could be impartial, defense counsel—after juror No. 9 left the courtroom—renewed Velasquez's motion to discharge her. Although two alternates were still available to replace juror No. 9, the court again denied Velasquez's motion.

Later, the court again discussed the matter with both counsel outside the presence of the jury after Eric and Alejandra testified. Citing *People v. Cochran, supra*, 62 Cal.App.4th 826, and *People v. Wallace, supra*, 44 Cal.4th 1032, the court confirmed its denial of Velasquez's motion to remove juror No. 9 from the panel. In making this ruling the court commented, "I must tell you I think most judges would excuse this juror."

We conclude the court erred again when it denied Velasquez's renewed motion to discharge juror No. 9 following her disclosure that she also had had a personal

27

relationship with Eric. Juror No. 9's bias as it related to Eric is clearly apparent from the record, which shows that Juror No. 9 revealed she indeed had formed an opinion about Eric's character for veracity when she told the court, "I don't remember him ever lying."

In applying the more stringent demonstrable reality standard of review, we consider "'not just the evidence itself, but also the record of reasons the court provides.'" (*Fuiava*, *supra*, 53 Cal.4th at p. 712.) Here, the case law on which the court relied does not support its decision.

In *Cochran*, one of the two cases cited by the court, the defendant claimed he was deprived of a fair trial because two jurors belatedly disclosed they knew members of the child victim's family. (*People v. Cochran*, *supra*, 62 Cal.App.4th at p. 828.) One juror stated that her acquaintance with the aunt of the mother of the child was very minimal, and the other juror disclosed she recognized but did not know a woman in the courtroom who turned out to be a grandmother of the victim. (*Id*. at p. 830.) In affirming the judgment of conviction, the Court of Appeal noted that "the evidence of guilt was extremely strong." (*Id*. at p. 831.) *Cochran* is easily distinguishable. First, unlike the juror in *Cochran* who had a "very minimal" acquaintance with relatives of the victim, the challenged juror here (juror No. 9) had had a personal relationship with two of the three victims who testified at trial, she indicated she had had a loving relationship with one of them (Alejandra); and she made candid statements early in the trial, following her ~~belated~~ disclosure of these relationships, in which she indicated that although she believed she could be impartial, "one side" of her would tend to believe one of the victims (Alejandra) and she did not remember the other victim (Eric) "ever lying." Second, unlike the

28

evidence of guilt in *Cochran*, the evidence of Velasquez's alleged guilt was not "extremely strong," as shown by the fact that the jury sent a note to the court asking how long it needed to deliberate before it became a hung jury.

The second case on which the court relied, *People v. Wallace*, *supra*, 44 Cal.4th 1032, also does not support the court's denial of Velasquez's motion to discharge juror No. 9. In *Wallace*, the defendant brought a motion for mistrial after the jury foreperson informed the court that either the defendant's cousin or a friend of the cousin told the foreperson in a hallway that defendant was innocent. (*Id*. at p. 1083.) The foreperson told the court that, although she felt a bit intimidated by the encounter, it would not affect her ability to be fair and impartial. (*Ibid*.) Applying the deferential abuse of discretion standard of review, the Court of Appeal affirmed the denial of the mistrial motion. (*Id*. at p. 1084.) *Wallace* is distinguishable on its facts, and is also inapposite because it involved the application of a deferential standard of appellate review, not the demonstrable reality standard, which is a "'more comprehensive and less deferential'" standard of review. (*Fuiava*, *supra*, 53 Cal.4th at p. 712.)

For all of the foregoing reasons, the judgment must be reversed and the matter remanded for further proceedings.[5]

---

[5] In light of our decision, we need not, and do not, reach Velasquez's numerous claims of prejudicial evidentiary error.

DISPOSITION

The judgment is reversed and the matter is remanded for further proceedings.

NARES, J.

WE CONCUR:

BENKE, Acting P. J.

HUFFMAN, J.

30